OPINION
Opinion by Judge BEA, Circuit Judge:
In the 1970s[1] Arizona enacted a statute which required each voter who votes in *617 person to cast his or her ballot at the precinct polling station at which the voter was registered to vote (the “precinct vote rule”). Since then Arizona has amended its statutes to adopt voting by mail, so long as the vote is received by election officials by election day. Arizona has also enacted early in-person voting during the 27 days preceding election day at designated early voting locations. Further, on election day, a voter who has received a ballot through the mail may deposit that ballot at any precinct in the county. But, if one is voting in the traditional in-person manner on election day, the precinct vote rule applies: for the vote to be valid, one must vote at the assigned polling place or vote center. A vote cast elsewhere will not be counted.
Feldman and other Appellants[2] here challenged the precinct vote rule on the grounds that it violated the federal Voting Rights Act of 1965 (“VRA”), 52 .U.S.C. § 10301, and unjustifiably burdened their election rights guaranteed by the Fourteenth Amendment of. the federal Constitution. The district court denied Feldman’s motion for a preliminary injunction. Feld-man brought an emergency appeal before us.
Feldman’s VRA claim is that the precinct vote rule imposes a discriminatory burden upon Hispanic, African-American and Native American citizens of Arizona (“minority voters”) because it affords them less opportunity than have other members of the electorate to participate in the electoral process and to elect representatives of their choice. To prove her claim, Feld-man proffered expert witness opinion evidence, some of which was accepted by the district court. Expert evidence, which the district court found relevant, showed that the share of minority in-person voters who failed to vote in their precincts exceeded their proportional representation in the electorate.
We find that the precinct vote rule, as administered by Arizona, probably does not impermissibly burden minority voters by giving them less opportunity than non-minorities to participate in the political process. But even assuming, without deciding, that it imposes a cognizable burden on minority voters, Feldman has not shown that Arizona’s enactment of the precinct vote rule is linked to social and historical conditions that have or currently produce racial discrimination against minority voters. Thus, we find that the district'court correctly denied relief for the claimed violation of the VRA.
Similarly, the district court correctly found that the constitutional violation claims failed because the precinct vote rule, when considered together with other options available to Arizona voters, imposes only a minimal burden upon minority and majority voters. Such a minimal burden is sufficiently justified" by Arizona’s interests in effective administration of voting in the State.
We affirm.
*618 I.
If an Arizona voter arrives at a polling place on election day to vote, but his or her name does not appear on the .voting register, he or she may still vote, but only through a provisional ballot. Ariz. Rev. Stat. §§ 16-122, 16-135, 16-584. This scenario may occur either because the voter recently moved or due to inaccuracies in the official records. Later, the state reviews all provisional ballots and counts thoss votes cast by voters confirmed to be eligible to vote. Id. Arizona will not count a provisional ballot cast out of the voter’s correct precinct (known as an “out-of-precinct”' or “OOP ballot”). Id. Widely-used early vote by mail alternatives permit voters to receive ballots by mail several weeks before an election and cast these ballots through the mail -without paying postage or by dropping them at any polling place in their county on election day. A.R.S. §§ 16-542, 16-548. Arizona recently has permitted counties to choose between the traditional precinct model and “vote centers,” wherein voters from multiple precincts can vote at a single location.[3] A.R.S. § 16-411. .
As noted, Arizona’s precinct vote rule has existed since the 1970s. In the 2012 elections,, Arizona election officials determined that 10,979 ballots were cast' OOP and thus not counted, which constituted 0.5% of total ballots cast in the state.[4] Feldman submitted an expert report by Dr. Jonathan Rodden, credited by the district court for the purposes of her motion, which concluded that minorities were overrepresented amongst those who cast OOP ballots in certain Arizona population centers. Other portions of the factual record are discussed as they become relevant.
In April 2016, Feldman sued Arizona[5] challenging its policy of rejecting OOP ballots. Feldman argued that Arizona’s rejection of OOP ballots pursuant to the precinct vote rule violates § 2 of the VRA by disparately burdening the electoral opportunities of Hispanic, Native American, and African American voters. She also argued the precinct vote rule violates the Fourteenth Amendment by improperly burdening voting rights and by raising equal protection concerns. In June 2016, Feldman moved for a preliminary injunction to require Arizona to count those portions of *619 OOP ballots for which the voter is eligible to vote.[6]
After full briefing, on October 11, 2016, the district court issued an order denying the motion for a preliminary injunction because it found Feldman was. unlikely to succeed on the merits of her claims or suffer irreparable harm if an injunction did not issue. As to the § 2 .claim, the. district court found that the disparate burden observed by Dr. Rodden did not constitute a cognizable harm under the VRA because it did not meaningfully limit minority groups’ access to the political process and was not shown to be linked to historical discrimination in Arizona. As to the Fourteenth Amendment claim, the district court held that Arizona’s precinct vote rule constituted a minimal burden on voting because it simply required that voters appear at the proper polling location on election day and was justified by the administrative advantages to the State of using a precinct voting system. The district court also concluded that Feldman was unlikely to succeed on her equal protection claim because she had not advanced a coherent theory for it.,
Feldman filed a timely notice of interlocutory appeal on October 16, 2016 and on October 18, 2016 filed an emergency motion with this court for an injunction pending appeal and for an expedited appeal. On October 19, 2016, a motions panel granted the request for an expedited appeal. The parties were directed to file simultaneous merits briefs by October 24, 2016, and the appeal was argued orally on October 26, 2016.[7]
II.
We incorporate section II of the opinion from the companion appeal that involves the same parties (Feldman v, Arizona Sec’y of State’s Office, No. 16-16698, 840 F.3d 1057, 2016 WL 6427146 (9th Cir. 2016)) as describing the proper standard of review for an interlocutory appeal of a denial of a preliminary injunction. Generally, a district court’s decision regarding preliminary injunctive relief is subject to limited review. Flexible Lifeline Sys., Inc., v. Precision Lift, Inc., 654 F.3d 989, 993-94 (9th Cir. 2011) (per curiam). The court should be reversed only if it abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. FTC v. Enforma Natural Products, 362 F.3d 1204, 1211-12 (9th Cir, 2004).
III.
VRA Claim
We also incorporate. section III.A.1 of the opinion from the companion appeal that involves the same parties (Feldman v. Arizona Sec’y of State’s Office, No. 16-16698, 840 F.3d 1057, 2016 WL 6427146 (9th Cir. 2016)) as describing the proper framework for analyzing a VRA § 2 claim. This opinion adopts the two-step framework adopted by a number of our sister circuits for evaluating a VRA § 2 claim. We use this. framework to determine *620 whether the district court properly concluded that Feldman was unlikely to succeed on the merits of her claim that Arizona’s precinct vote rule violated § 2 of the VRA. Feldman offers two sets of arguments as to why the district court erred in concluding she was unlikely to succeed on the merits of her VRA § 2 claim. We consider each in turn.
A.
First, she argues that Arizona’s precinct vote rule imposes a discriminatory burden on minority voters in violation of VRA § 2. Specifically, she asserts that the report by Dr. Rodden, credited by the district court for the purposes of this motion, was sufficient to show a cognizable disparate burden under the VRA.
We have grave doubts that the precinct vote rule gives minority voters less opportunities to participate in the political process than it gives to other, majority voters. That more minorities vote OOP than is reflective of their proportionate number in the electorate does not prove that the precinct vote rule denies or abridges their opportunity to learn of the locations of their precinct polling places or to get to them in time to vote. There is no evidence in the record that minority voters were given misinformation regarding the locations of their correct precinct polling places, while non-minority voters were given correct information.[8] Nor was there evidence that minority voters’ precinct polling places were located where it would be more difficult for minority voters to find them, than were the corresponding precinct polling places of non-minority voters.
A.R.S. § 16-584 merely imposes a prerequisite to voting: it requires voters to vote in their precinct or them vote will not be counted. It is analogous to a registration requirement: If prospective voters do not register to vote, they cannot vote; their vote will not be counted. Thus, it might seem that the required causal connection between the voting prerequisite and the observed disproportionate result simply was not proved. Gonzalez v. Arizona, 677 F.3d 383, 405 (9th Cir.2012) (“Said otherwise, a § 2 challenge based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes that disparity, will be rejected.”) (internal quotation marks omitted).
Nonetheless, we recognize that the district court found the results of the expert witness’s tabulation to have shown disproportionate disqualification of minority votes, ascribed by the district court in part to the precinct vote rule. Giving due deference to the district court’s factual findings, we will presume, without deciding, that Feldman did carry her burden of proof on the first step of her VRA claim. But, we affirm the district court’s finding that she did not carry her burden of proof on the second step of her VRA claim: that the disproportionate burden, in light of the totality of the circumstances, interacted with racial discrimination “to cause an inequality in the opportunities enjoyed by [minority] and [non-minority] voters to elect their preferred representatives.” Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).
B.
Second, Feldman argues that the district court misapplied the Gingles fac *621 tors, which are non-exclusive factors incorporated by the Supreme Court to guide courts’ analyses of whether a voting practice, viewed in light of the totality of the circumstances, limits minority access to electoral opportunities or- the political process.[9] Gingles, 478 U.S. at 44-45, 106 S.Ct. 2752. On appeal, Feldman asserts that the district court erred as “a matter of fact and law” in its analysis of the Gingles factors. As to the purported error of law, Feldman specifies that: “As a legal matter, the court erred in holding that establishing a link between a disparate burden and socioeconomic disparities resulting from discrimination does not satisfy step two of-the test for VRA vote-denial claims.” On the contrary, the district court indeed applied this correct standard. It found that “Plaintiffs have only loosely linked the observed disparities in minority OOP voting to social and historical conditions that have produced discrimination.” The district court simply found that Feldman had not established a sufficient link. Feldman is left with her challenge to the district court’s factual findings on the second prong, which are reviewed for clear error. Independent Living Ctr. of S. California, Inc. v. Shewry, 543 F.3d 1050, 1055 (9th Cir. 2008). At oral argument,, Feldman’s counsel chose not to press her claim of factual finding error. Nonetheless, we must consider whether the district court’s conclusion that the factual record did not show that the observed burden “in part [was] caused -by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class” as reflected in the Gingles factors was clearly erroneous. League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 240 (4th Cir. 2014) (internal quotation marks omitted).
In challenging the district court’s factual findings, Feldman references the expért report of another expert witness, Dr. Allan Lichtman, as well as evidence (some of it also from Dr. Lichtman’s report) that minority voters 1) have higher rates of residential mobility, 2) have less access to vehicles and hold jobs without flexible working hours, and 3) cannot inform themselves about voting rules because of a historical language barrier, as sufficient to satisfy the second prong of VRA § 2. For the reasons discussed below, the district court’s factual determination that this evidence failed to establish the requisite link was not clearly erroneous.
The district court expressly referenced the proper standard for the second prong .of a VRA § 2 analysis: “that burden [identified in the first prong] .must in part be caused by or linked to social and historical conditions that have- or currently produce discrimination against members of *622 the protected class,” which it recognized can be satisfied in part by turning to the Gingles factors. The district court then looked to the totality of the circumstances (as required by the statute) to examine the practical effect of the precinct vote rule on minority voters’ access to the political process and electoral opportunities. Finally, the district court examined whether Arizona’s precinct vote rule was caused by or linked to social or historical conditions that have produced discrimination and found that various socioeconomic disparities referenced by Feldman, that correlated to some degree with race were alone insufficient to satisfy this second prong.
On appeal, Feldman cites the report by Dr. Lichtman to establish that the Gingles factors show that Arizona’s precinct vote rule is linked to or caused by historical or ongoing discriminatory practices that limit minority access to electoral opportunities or the political process. Reading his report reveals several inaccuracies that would clearly justify the district court’s decision not to credit it as sufficient to satisfy the Gingles factors. First off, Lichtman references the fact that Arizona was subject to VRA § 5 preclearance requirements until 2013 as evidence of official discrimination. This assertion, of course, contradicts the clear, guidance of the Supreme Court from Shelby County v. Holder, which found the formula used to determine which states were subject to preclearance. requirements unconstitutional because it. was “based on 40-year-old facts having no logical relation to the present day.” — U.S. -, 133 S.Ct. 2612, 2629, 186 L.Ed.2d 651 (2013). Then, Licht-man points to Arizona’s passage, of a voter initiative which banned “affirmative action” (racial preferences) as evidence of a history of “official discrimination.” Ending preferential treatment of individuals on the basis of their race, as a logical matter, cannot be considered discrimination and such measures have consequently been upheld by this and other courts. See Schuette v. Coalition to Defend Affirmative Action, — U.S. -, 134 S.Ct. 1623, 188 L.Ed.2d 613 (2014) (Michigan ballot Proposal 2); Coalition for Econ. Equity v. Wilson, 122 F.3d 692 (9th Cir.1997) (California ballot Proposition 209). Then, Lichtman points to other actions by Arizona to show a history of official discrimination, such as reducing the number of polling locations in the 2016 presidential primary election, waiting several years longer than some other states to declare Martin Luther King Day a state holiday, or promulgating voter identification laws that were later found to be preempted by federal statute, which have at-best a very tenuous connection to discrimination.
Given such errofs, and given substantial rebuttal from other experts (one of whom stated that Lichtman’s report is “single-minded, conclusory, and one-sided, and frequently omit[s] mention of contradictory data or important context”), Lichtman’s report is insufficient to meet the second prong of the VRA test. Even taken at face value, the Lichtman report fail's to show that any burden from the precinct vote rule on minorities’ opportunity to participate in the political process is “caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.” Ohio Democratic Party v. Husted, 834 F.3d 620, 637 (6th Cir. 2016) (quoting Ohio State Conference of NAACP v. Husted, 768 F.3d 524, 554 (6th Cir. 2014)). The Lichtman report does not show how any historical racial discrimination caused more residential mobility or less access to transportation, which it claims are the background reasons for more minority voters than non-minority voters voting in the wrong precinct. Accordingly, the district court 'did not clearly err "in concluding that *623 Feldman failed to prove that racial discrimination is a substantial cause' of any socioeconomic disparities alleged to cause more out-of-precinct voting by minorities.
Moreover, any linkage between racial discrimination, the mobility and transportation access issues noted by the Lieht-man report, and' the evidence that more minority voters than non-minority voters vote outside their precinct, is too attenuated to support a claim under § 2 of the VRA, which requires a connection between a challenged voting rule and racial discrimination. As the Sixth Circuit explained, the second .prong of. the VRA test considers whether the challenged practice “has the effect, as it interacts with social and historical conditions, of causing racial inequality in the opportunity, to vote.” Ohio Democratic Party v. Husted, 834 F.3d at 638 (emphasis omitted); id. (concluding that “the second step asks not just whether social and historical conditions ‘result in’ a disparate impact, but whether the challenged voting standard or practice causes the discriminatory impact as it interacts with social and historical conditions”) (emphasis omitted). As the district court noted, “if the requisite causal link under § 2 could be established primarily .by pointing to socioeconomic disparities between minorities and whites, then nearly all voting regulations could conceivably violate the VRA because nearly all costs of voting are heavier for socioeconomically disadvantaged voters.” Indeed, at oral argument, Feldman’s counsel was unable to explain why the same causal theory used in this case would not. equally invalidate states’ registration requirements if an expert could show that the cost of registration fell more heavily on minorities than non-minorities, and fewer were registered to vote.
For these reasons, the district court’s decision not to credit this report as sufficient to prove the existence , of the Gingles factors was not “illogical, implausible, or without support in inferences that may be drawn from the facts in the record.” United States v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009).
Feldman further argues that evidence showing that minority voters change residences more often than non-minority voters, are less able to travel to different polling locations because they are less likely to own vehicles or have jobs with flexible work schedules, and face language barriers as many do not speak English should satisfy the fifth' Gingles factor. However, the fifth Gingles factor reads: “the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process” 478 U.S. at 37, 106 S.Ct. 2752 (internal quotation marks omitted) (emphasis added). The district court accepted that minority voters may be disparately burdened by the limitations cited by Feldman, but properly found she had not shown that these burdens are “the effects of discrimination.”[10] Id. Feldman’s brief cites only to Dr. Lichtman’s report, which the district court could, properly discount for the above-discussed reasons, and a portion of Dr. Rodden’s report discussing the unrelated question of voter turnout rates to prove that official discrimination caused the observed disparities. As such, it was not clearly erroneous for the district court to conclude that Feldman failed to *624 establish that this Gingles factor turned in her favor.
In addition to the factors listed in Gingles, a court must also consider the state’s interest in its electoral system, which the Supreme Court has held is “a legitimate factor to be considered by courts among the ‘totality of the circumstances’ ” in determining whether a § 2 violation has occurred. Houston Lawyers’ Ass’n v. Attorney Gen. of Tex., 501 U.S. 419, 426-27, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991). Here, the district court found that there were numerous policy considerations supporting the use of in-precinct voting requirements. Our sister circuit has also recognized that “[t]he advantages of the precinct system are significant and numerous.” Sandusky Cty. Democratic Party v. Blackwell, 387 F.3d 565, 569 (6th Cir. 2004). The precinct system (1) “caps the number of voters attempting to vote in the same place on election day,” (2) “allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies,” (3) “allows each precinct ballot to list only those votes a citizen may cast, making ballots less confusing,” (4) “makes it easier for election officials to monitor votes and prevent election fraud,” and (5) “generally puts polling places in closer proximity to voter residences.” Id.
As the Gingles factors are non-exclusive, 478 U.S. at 45, 106 S.Ct. 2752, we also look to whether Arizona’s precinct vote rule interacts with racial discrimination to limit minority voters’ access to the political process or electoral opportunities. The limited numerical burden of the precinct vote rule (roughly seven thousand non-minority voters and four thousand minority voters, together 0.5% of overall voters) indicates that it does not practically affect minority access to electoral opportunities and the political process. The existence of widely-used and convenient alternatives to in-person voting on election day (such as early voting or vote-by-mail) further supports this conclusion.
In sum, looking at the totality of the circumstances, the relevant Gingles factors, the limited number of OOP ballots not counted because of Arizona’s precinct vote rule, and the convenient alternatives to in-person voting on election day together suggest that Feldman will likely not be successful on the second step of her VRA § 2 claim. That is because we have grave doubts both that “a searching practical evaluation” would suggest that Arizona’s precinct vote rule will limit minority individuals’ “opportunity to participate in the political processes,” but even were such opportunity limited, that such limitation was caused by historical or present official racial discrimination. Gingles, 478 U.S. at 44-46, 106 S.Ct. 2752. The district court’s conclusions here were not clearly erroneous.[11]
*625 IV.
Fourteenth Amendment Claim
The district court concluded that Arizona’s precinct vote rule was constitutionally permissible under the Anderson-Bwrdick framework because it imposed a minimal burden on voting and served important regulatory and administrative interests. Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (citing Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)).
Feldman accepts the Anderson-Burdick framework as the proper analytical structure, but asserts that the district court did not properly credit the burden that Arizona’s precinct vote rule and consequent rejection of all OOP ballots actually places on voting rights. She emphasizes that since 2012, “some 14,500 voters” have had their ballots discarded because of this practice, which is substantially more (both as a proportion and absolute number) than in any other state; She stresses that Arizona’s precinct vote rule, taken in conjunction with the difficulties that result from voters’ confusion about polling locations due to frequent changes and erroneous public communications, together constitute a substantial burden on voting.
According to the district court’s calculations, Arizona’s OOP ballot policy leads to 0.5% of total votes cast not being counted at- all. Beyond being a very small proportion of total votes cast, as the district court points out, the practical burden that Arizona’s precinct vote rule actually imposes is nothing more than requiring voters to go to the proper polling location or *626 vote by mail, the option on which roughly 80% of Arizona voters rely. While the dissent makes much of allegedly inconvenient in-person voting procedures and frequently changing polling locations, Feldman does not challenge these practices in this lawsuit. Moreover, it is undisputed that Arizona undertakes substantial outreach (despite isolated informational errors) to educate voters so they can arrive at the right polling place. Finally, the Supreme Court has held that substantially more demanding rules, such as requiring voters to acquire a government identification card to cast a ballot, do not meaningfully burden voting under the Fourteenth Amendment. Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 197-200, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (controlling opinion of Stevens, J.). Being required to go to the proper polling location cannot be deemed a burden on voting as this requirement is inherent to the very essence of in-person voting. See Colo. Common Cause v. Davidson, 2004 WL 2360485, at *14 (Colo. Dist. Ct. Oct. 18, 2004) (“[I]t does not seem to be much of an intrusion into the right to vote to expect citizens, whose judgment we trust to elect our government leaders, to be able to figure out their polling place.”); Serv. Emps. Int’l Union Local 1 v. Husted, 698 F.3d 341, 344 (6th Cir. 2012) (voters should not be absolved “of all responsibility for voting in the correct precinct or correct polling place by assessing voter burden solely on the basis of the outcome—i.e., the state’s ballot validity determination”).
Feldman asserts that the district court erred in its assessment of the burden by ignoring the fact that thousands of votes are .not counted under the precinct vote rule, and that the burden on the voters casting the OOP ballots is severe because those voters are disenfranchised entirely. However, this argument ignores that every voting qualification—including voter registration, for example—will keep at least one person from casting a ballot that is counted. Under this theory, every voting qualification would be subjected to strict scrutiny, because the burden would be “severe” on at least some number of individuals, however small that number might be. That result simply can’t be, as the Supreme Court expressly instructed in Burdick. 504 U.S. at 433, 112 S.Ct. 2059.
Given that the district court properly concluded that Arizona’s precinct vote rule imposed a minimal burden on voting, the Anderson-Burdick framework does not require a searching inquiry into the justifications for this practice. Pub. Integrity All., Inc. v. City of Tucson, 836 F.3d 1019, 1023 (9th Cir.2016) (en banc). Arizona’s precinct vote rule and resulting policy of rejecting OOP ballots makes administering a precinct voting system considerably less costly by not requiring election workers to undertake a time-consuming and uncertain process of separating eligible from ineligible votes on thousands of OOP ballots and recounting the potentially valid ones. This, in turn, makes it easier to use precinct voting systems, which have many practical advantages such as limiting polling-place wait times and reducing voter confusion by proyiding only ballots tailored to the persons and issues on which the voter is entitled to vote. See Sandusky, 387 F.3d at 569. Moreover, public knowledge that Arizona would try to identify and count valid portions of OOP ballots could conceivably lead to a substantial number of voters casting their ballots at improper polling locations if they were mostly concerned with voting in state-wide or national elections and a consequent increase in cost and delay in counting those OOP ballots (see infra, page 638-39 et seq.). Further, the failure to enforce the precinct vote rule will depress voting for local candi *627 dates and issues. These reasons are sufficient to bear Arizona’s burden of asserting interests that outweigh the minimal burden that the precinct vote rule imposes on voting. The district court should be affirmed on this point.[12]
V.
Feldman asserts that restrictions on fundamental voting rights inherently constitute irreparable harm and that the longevity of an unconstitutional practice offers no basis to deny a challenge to that practice. Because the district court properly concluded that Feldman was unlikely to succeed on the merits of her claims, it was also correct to conclude that she would not suffer irreparable harm absent an injunction. The district court also found that Feldman’s decision to wait until decades after the establishment of Arizona’s precinct vote rule also suggested she would not be irreparably harmed if an injunction did not issue. Feldman’s suggestion that she had not “delayed” referred only to her actions since filing the lawsuit' in the spring of 2016, but did not address the many years this policy stood on the books before her lawsuit was filed. Taken together, the district court’s conclusion regarding the lack of irreparable harm should an injunction not issue was not an abuse of discretion and is affirmed.
VI.
“A plaintiff seeking a preliminary injunction must establish ... that the balance of the equities tips in his favor, and that an injunction is in the public interest.” Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Alternatively, “a preliminary injunction is also appropriate when a plaintiff raises ‘serious questions’ as to the merits and ‘the balance of hardships tips sharply in [plaintiffs] favor.’ ” Puente Arizona v. Arpaio, 821 F.3d 1098, 1103 n.4 (9th Cir. 2016) (quoting Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011)). The balance of the equities and public interest preliminary injunction factors “merge when the Government is the opposing party.” Nken v. Holder, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).
The Supreme Court has affirmed that “[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, ‘ we must live.” Burdick, 504 U.S. at 441, 112 S.Ct. 2059 (quoting Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)), Nevertheless, the underlying right at stake must be tempered by the fact that only 11,000' out of more than 2 million ballots are affected by the law challenged by Feldman. Moreover, Ninth- Circuit precedent has found' that “interference with impending elections is extraordinary ... and interference with an election after voting has begun is unprecedented.” Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 919 (9th Cir. 2003); see also Purcell v. Gonzalez, 549 U.S. 1, 4-5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006). Along these lines, in Gonzalez v. Arizona, this court affirmed a denial of a preliminary injunction of a voter ID law in part-because the state had “invested enormous resources in preparing to apply [the voting law]” and changing election procedures would cause confusion among election officials and voters. 485 F.3d 1041, 1051-52 (9th Cir. 2007).
*628 The facts of the situation here are analogous. Arizona Elections Director Eric Spencer affied that instituting a new vote counting procedure “would likely delay the canvass process, and therefore likely put the counties and the state past the statutory deadlines.” He also stated, “[t]he elections budgets for counties are likely already set and do not necessarily include funds to cover the additional labor and duplicate ballots that would be required to count OOP ballots.” Pima County Elections Director Brad Nelson explained that partially counting OOP ballots would take “additional time, manpower, and financial resources” because counties likely would use a manual approach with four election workers similar to the method for counting damaged ballots. Nelson estimated the manual approach could take up to fifteen minutes per OOP ballot. At oral argument Appellees’ counsel asserted that existing automated vote counting technologies could not simply be altered to count the votes at the top (for national and statewide offices) of OOP ballots because so doing would potentially violate state and federal laws requiring pre-use testing of all vote counting technologies. Also, if preliminary injunctive relief is granted, a greater number of voters may decide to vote outside their precinct or incorrectly believe they can vote at any location, creating further systemic costs.
These facts suggest that the district court did not abuse its discretion. The district court was clearly cognizant of the impending election and the cost that granting preliminary injunctive relief would have both for Arizona’s election budgets as well as uncertainty in light of last-minute rule changes.
VII.
The district court correctly concluded that Feldman was unlikely to succeed on the merits of her VRA or Fourteenth Amendment claims. It also properly concluded that she would not face irreparable harm if an injunction did not issue and that the balance of equities did not tip in her favor. For these reasons, the district court did not abuse its discretion in denying Feldman’s motion for a preliminary injunction.
AFFIRMED.

. Ariz. Rev. Stat. §§ 16-122, 16-135, 16-584 (codified in 1979).

. The appellants here (plaintiffs below) are Leslie Feldman, Luz. Magallanes, Mercedez Hymes, Julio Morera, and.Cleo Ovalle, registered Democratic voters in Maricopa County, Arizona; Peterson Zah, former Chairman and First President of the Navajo Nation and registered voter in Apache County, Arizona; the Democratic National Committee; the DSCC, aka Democratic Senatorial Campaign Committee; the Arizona Democratic Party; a committee supporting the election of Democratic United States Representative Ann Kirkpatrick to U.S. Senate; and Hillary for America, a committee supporting the election of Hillary Clinton as President of the United States. The intervenor-plaintiff/appellant is Bernie 2016, Inc., a committee supporting the election of Bernie Sanders as President of the United States. For convenience, we refer to the appellants as "Feldman.”

. In 2011, Arizona revised its election law to permit counties to choose between using "vote centers” or precincts. A.R.S, § 16-411. The "vote center” approach permits voters from diverse voting precincts in a county to receive a ballot tailored to include races for which they are eligible and to cast it at a single location. Id. The "precinct" approach restricts a voter to receiving and casting his in-person ballot at his precinct’s designated polling place. Under either approach, the ballot received by a voter is tailored to include only those candidates or issues for which the voter is entitled to vote based on the voter’s claimed place of residency. The ballot will not be counted if the voter is found to be ineligible.

. In the 2008 election 14,885 OOP ballots were not counted, constituting 0.6% of total ballots cast. Smaller numbers of OOP ballots were rejected in the 2010 (0.3% of total ballots cast) and 2014 (0.2% of total ballots cast) elections,

.The appellees here (defendants below) are the Arizona Secretary of State’s Office; Arizona Secretary of State Michele Reagan in her official capacity; the Maricopa County Board of Supervisors; members of the Mari-copa County Board of Supervisors Denny Barney, Steve Chucri, Andy Kunasek, Clint Hickman, and Steve Gallardo in their official capacities; the Maricopa County Recorder and Elections Department; Maricopa County Recorder Helen Purcell and Maricopa County Elections Director Karen Osbourne in their official capacities; and Arizona Attorney General Mark Brnovich in his official capacity.

. For example, most OOP voters would be eligible to vote in the Presidential‘election even if they were ineligible to vote for precinct-specific elections because they were not in fact residents of the precinct in which they erroneously voted.

. In addition to this appeal, Feldman appealed another of the district court’s orders denying a separate motion to preliminarily enjoin other election practices challenged in the complaint. That appeal has similarly been expedited and is the subject of a separate disposition. See Feldman v. Arizona Sec’y of State's Office, No. 16-16698, 840 F.3d 1057, 2016 WL 6427146 (9th Cir. 2016).

. There is evidence in the record that a small number of Spanish language voter communications included erroneous information, but there is no indication that these were anything but isolated typographical errors and, in any event, none of these errors gave minority voters incorrect information regarding the location of their polling places.

. These factors include: "1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; 2) the extent to which voting in the elections of the state or political subdivision is racially polarized; 3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; 4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; 5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, -which hinder their ability to participate effectively in,the political process; 6) whether political campaigns have been characterized by overt or subtle racial appeals; [and] 7) the extent to which members of the minority group have been elected to public office in the jurisdiction.” 478 U.S. at 36-37, 106 S.Ct. 2752 (internal quotation marks omitted).

. We make no claim that the fifth Gingles factor requires proof of intentional discrimination, but only, as the text of Gingles demands, proof that the adverse socioeconomic conditions be the “effects of discrimination” and not of something else, such as recent arrival into the workforce. 478 U.S. at 37, 106 S.Ct. 2752.

. The dissent references numerous parts of the district court record but fails to engage with the factual sufficiency of this material nor does it recognize the deferential standard of review for a district court’s factual findings. Smith v. Salt River Project Agrie. Improvement & Power Dist, 109 F.3d 586, 591 (9th Cir, 1997). For example, the dissent points to another expert report, by Dr. David Berman, which discusses racial discrimination in Arizona history as sufficient to satisfy the first Gingles factor. Again, as with the Lichtman report, the conclusions of Berman’s report are not unrebutted. Appellees’ expert opined that Berman's description of a “linear trajectory [from] past discrimination to current legislation concerning voting ... is a misuse of historical interpretation.” Much of Berman’s report focuses on a voting literacy test passed in Arizona in 1912 and a 1928 Arizona Supreme Court ruling limiting Native Americans’ eligibility to vote in state (as opposed to national) elections, events occurring roughly one-hundred years ago. Since the 1970s the evidence of racial discrimination in *625 Arizona cited by Dr. Berman has been notably thin, namely that Arizona had been subject to preclearance requirements (later declared unconstitutional) and had promulgated voter ID and citizenship voting laws that have later been upheld by this court[1] or preempted by federal legislation, respectively. See Gonzalez, 677 F.3d at 383. Also, English-only education initiatives are often widely supported by minority voters because they want to learn English and to our view promote social inclusion by ensuring all Americans have a common means of communication and improved education. As with the Lichtman report, these inaccuracies and misstatements would offer substantial justification for the district court to disregard Berman’s report. •
As to the sixth Gingles factor, the dissent claims there was "substantial evidence” of campaigns characterized - by overt or subtle racial appeals apparently on the basis of four discrete campaign statements referenced in Dr. Lichtman’s problematic report over the course of the past ten years. This is thin evidence indeed.
As to the seventh Gingles factor, the dissent again cites Dr. Berman's report chronicling a disparity between the population of certain minority groups in Arizona and their representation in the state legislature. Even assum-mg these figures are accurate, they also show that Hispanic representation in the state legislature grew by nearly 40% in the past decade. Other evidence in the record shows that Arizona has roughly the same number of Hispanic legislators as California, even though California has a much larger Hispanic population. Moreover, VRA § 2 expressly provides "[tjhat nothing in this section establishes a right to have members of protected class elected in numbers equal to their proportion in the population.” 52 U.S.C. § 10301(b).
Taken together, the district court appreciated the thin evidentiary basis (despite the thousands of pages submitted to the court) supporting Feldman's claim in making its factual determinations, which we review for clear error. Salt River Project, 109 F.3d at 591. Most importantly, a mechanical recitation of the Gingles factors misses the substantive analysis required by VRA § 2: which is "a searching practical evaluation" of the factual record to determine if a challenged voting regulation will limit minority individuals' "opportunity to participate in the political processes.” Gingles, 478 U.S, at 44-46, 106 S.Ct. 2752. That Arizona requires all non-minority and minority in-person voters to vote in their assigned precinct or vote center does not undermine minority access to the political process or electoral opportunities.

. Although' Feldman raised an Equal Protection claim to the district court, she did not challenge the district court's ruling on this question on appeal and we do not address it here.

. The majority and the district court seem to discount this effect because the plaintiffs are not challenging the precinct system per se. However, that is a red herring. Plaintiffs are challenging the effect of the system, which can easily be remedied by counting the ballots cast, rather than changing the entire precinct system.