UNITED STATES of America,

v.

**Purvis Lamar ELLIS, et al., Defendants.**

**Case No. 13–CR–00818 PJH**

United States District Court, N.D. California.

Signed 08/24/2017

Joseph Michelangelo Alioto, Jr., U.S. Department of Justice U.S. Attorney's Office, Oakland, CA, Scott D. Joiner, William Frentzen, U.S. Attorney's Office, San Francisco, CA, for United States of America.

Martha A. Boersch, Boersch Shapiro LLP, James Phillip Vaughns, Attorney at Law, Oakland, CA, Christopher J. Cannon, Sugarman & Cannon, Edwin Ken Prather, Prather Law Offices, San Francisco, CA, for Defendants.

## PRETRIAL ORDER NO. 3 DENYING MOTIONS TO SUPPRESS

PHYLLIS J. HAMILTON, United States District Judge

On August 2, 2017, the court held a hearing on the motions of defendant Purvis Lamar Ellis to suppress evidence obtained from use of Stingrays on behalf of all defendants; to suppress evidence seized from Apartment 212 on behalf of all defendants; and to sever. The court DE-

NIED Ellis's motion to sever for the reasons stated on the record. Doc. no. 306. Having considered the relevant legal authority, the papers, argument of counsel, and the evidence in the record, the court DENIES the motions to suppress, doc. nos. 304, 307, for the reasons stated at the hearing and set forth below.

## I. Motion to Suppress Evidence Obtained from Use of Cell Site Simulators

Ellis moves on behalf of all defendants to suppress any and all evidence obtained or derived from the use of cell site simulators ("CSS"), generally referred to as Stingrays. Doc. no. 304. As described in the Department of Justice Policy Guidance ("DOJ Policy") cited by Ellis, a CSS functions by transmitting as a cell tower, such that cell phones in its proximity transmit signals to the CSS, which the cell phones identify as the most attractive cell tower in the area. Doc. no. 304 at 3–5 (citing *United States v. Patrick*, 842 F.3d 540, 542–43 (7th Cir. 2016) (quoting DOJ Policy, Sept. 3, 2015), *reh'g and reh'g en banc denied* (May 9, 2017)). "When used to locate a known cellular device, a cell-site simulator initially receives the unique identifying number from multiple devices in the vicinity of the simulator. Once the cell-site simulator identifies the specific cellular device for which it is looking, it will obtain the signaling information relating only to that particular phone." *Id.* (internal marks omitted). *See also* doc. no. 321, Ex. G ¶ 6 and Ex. I ¶ 6.

As supported by the record, Ellis has shown that the Oakland Police Department ("OPD") and the Federal Bureau of Investigation ("FBI") each used a Stingray to locate Ellis's cell phone starting in the early morning hours of January 22, 2013, following the shooting of an OPD officer the evening of January 21, 2013. Ellis contends that the use of these Stingrays amounted to a warrantless search requir-

ing suppression of any evidence obtained or derived from the Stingrays, and/or an evidentiary hearing. Ellis further contends that the use of the Stingrays likely intercepted communications in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

### A. Fourth Amendment Search
#### 1. Legal Standard

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Jones*, 565 U.S. 400, 404, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. *Simmons v. United States*, 390 U.S. 377, 389–390, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

The Supreme Court recognizes two tests to determine whether a "search" within the meaning of the Fourth Amendment occurred. *Jones*, 565 U.S. at 411, 132 S.Ct. 945. The first is the "classic" common-law trespass test, as applied by the Court in *Jones*, 565 U.S. at 404–05, 132 S.Ct. 945. Under that property-based approach, government actions amount to a search when "[they] physically occupy private property for the purpose of obtaining information" without consent. *Id.* The Court explained that before Justice Harlan's concurrence in *Katz* articulated the "reasonable expectation of privacy" standard, "for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates." *Jones*, 565 U.S. at 406, 132 S.Ct. 945. The Court in *Jones* held that attachment of a Global Positioning System (GPS) tracking device

to a vehicle, and the subsequent use of that device to monitor the vehicle's movements on public streets, was a search within the meaning of the Fourth Amendment, reasoning that "[t]he Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id.* at 404–05, 132 S.Ct. 945 (citation omitted).

■■■ Second, under the reasonable expectation of privacy test, the Fourth Amendment protects against an unreasonable search of an area in which (1) a person exhibits actual, subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable. *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Under *Katz*, the capacity to claim Fourth Amendment protection does not strictly depend on a property right in the invaded place, but whether the person asserting the claim has a legitimate expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (citing *Katz*, 389 U.S. at 353, 88 S.Ct. 507).

### 2. Use of Stingray Constitutes a Search

Ellis asserts several grounds for determining that the use of the Stingray to locate his cell phone in real time amounted to a Fourth Amendment search requiring issuance of a warrant: that the Stingray intruded into the constitutionally protected area of a private residence and that the Stingray violated Ellis's privacy interests both in the use and location of his cell phone and in his public movements.

In his reply, Ellis raises the argument that the government is bound by its concession in other cases that the use of a Stingray amounts to a search. Doc. no. 324

at 2–3. However, the court finds that these concessions were limited for the purposes of each particular case, and do not amount to a binding admission by the government. *See Patrick*, 842 F.3d at 544, 545 (where the government conceded that use of a cell site simulator is a search for purposes of that litigation, the court noted that questions about whether use of a simulator amounts to a search "have yet to be addressed by any United States court of appeals," reserving the issue).

#### a. Standing

■■■ As a threshold matter, the government contends that only Ellis has standing to challenge the use of a Stingray to locate his cell phone, and that no other defendant has standing to bring a motion to suppress. To the extent that Ellis challenges the potential collection of signals from phones used by non-parties, the government correctly points out that Ellis lacks standing to invoke the privacy rights of anyone else whose cell phone may have been located by the Stingrays. In light of the record showing that two Stingrays were used to locate Ellis's cell phone, and no other defendant's cell phone, Ellis alone has standing to bring the instant motion to suppress evidence obtained through use of Stingrays. *See Rakas*, 439 U.S. at 133–34, 99 S.Ct. 421 ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.") (citation and marks omitted).

#### b. Intrusion on Private Residence

■■■ Starting with the *Jones* trespassory approach, Ellis argues that the government's use of the Stingrays to monitor and track his phone was a search under the Fourth Amendment because the Stingrays emitted signals that penetrated the walls of private dwellings that were not open to visual surveillance. Doc. no. 304 at 15 (citing *United States v. Karo*, 468 U.S. 705,

714, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) and *Kyllo v. United States*, 533 U.S. 27, 29, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)). In *Karo*, the Court held that the warrantless "monitoring of a beeper in a private residence, a location not open to visual surveillance, violates the Fourth Amendment rights of those who have a justifiable interest in the privacy of the residence." In *Kyllo*, the Court held that use of a thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home constitutes a "search" within the meaning of the Fourth Amendment, reasoning that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area' [ ] constitutes a search—at least where (as here) the technology in question is not in general public use." 533 U.S. at 34, 121 S.Ct. 2038 (quoting *Silverman v. United States*, 365 U.S. 505, 512, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). Ellis argues that because a Stingray emits signals that penetrate the walls of constitutionally protected spaces, it amounts to trespass and constitutes a search under *Silverman*, 365 U.S. at 511–12, 81 S.Ct. 679 (holding that attaching a spike mike to a heating duct of a home was a search, reasoning that technical trespass is not necessary for Fourth Amendment violation but "actual intrusion into a constitutionally protected area" is sufficient) and *Jones*, 565 U.S. at 410, 132 S.Ct. 945 (holding that warrantless installation of GPS device to vehicle encroached on a protected area in violation of Fourth Amendment).

The government responds that Ellis lacks standing to assert any protected interest in the apartment where he was located because he was in someone else's home when the Stingray located his cell phone, not his own residence which was known to be Apartment 212. Opp. at 6. If Ellis had been in someone else's private residence at the time his cell phone was located by the Stingray, he could not strictly assert a violation of any property-based or privacy-related interest in that residence. *See Kyllo*, 533 U.S. at 34–35, 121 S.Ct. 2038 and *Karo*, 468 U.S. at 714, 104 S.Ct. 3296.

Ellis argues that there is no evidence in the record to support the government's position that Ellis was not in his own home when his cell phone location was detected at a specific apartment. The record indicates that Ellis and other occupants of Apartment 112 were escorted out of the building at around 10:52 am, but it is not clear from the record where Ellis was located when the Stingray tracked his cell phone location. The evidence in the record only suggests that the Stingray, in conjunction with "a cell site simulator augmentation device," located Ellis's cell phone at a particular location that is not identified in the declarations. *See* doc. no. 321, Ex. I (declaration of unnamed FBI Special Agent whose identifying information was redacted to protect his identity, see doc. no. 244 (8/8/16 transcript) at 15–16; previously submitted in this case as doc. no. 225–1).

The record is therefore insufficient to determine whether Ellis had any protectable interest in the residence where his cell phone was located. It is unnecessary to decide this issue of Ellis's standing to claim Fourth Amendment protection for the private residence, however, because Ellis does have standing to challenge the use of the Stingray to locate his cell phone based on a reasonable expectation of privacy in one's real-time cell phone location, as discussed below.

**c. Reasonable Expectation of Privacy in Real–Time Location of Cell Phones**

 Under the *Katz* test, Ellis has demonstrated that the use of the Stingray

devices amounted to a search in violation of a reasonable expectation of privacy in the real-time location of his cell phone.

The Ninth Circuit has not decided the question presented here whether use of cell site simulators to locate cell phones in real time amounts to a search, nor the issue whether there is a reasonable expectation of privacy in one's cell phone location. In *Patrick*, the first circuit court opinion to address the use of Stingrays, the Seventh Circuit noted that the issue remains unsettled as to whether the use of cell site simulators amounts to a search, by analogy to GPS locators which are treated as searches when police enter private property to install them under *Jones*, and which may impinge on expectations of privacy when used for long-term monitoring. *Patrick*, 842 F.3d at 543–44 (citing *Jones*, 565 U.S. at 413–31, 132 S.Ct. 945 (concurring opinions of Sotomayor and Alito, JJ.)). The court in *Patrick* also discussed the competing view that the use of cell site simulators is more like the use of a pen register, which is not a search because it reveals the making of a call and the number called but not the call's communicative content, or the use of a beeper, which is not a search because it reveals a suspect's location but nothing else. *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), and *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983)). *Patrick* did not, however, decide this question because the government "conceded for the purpose of this litigation that use of a cell-site simulator is a search." *Id.* at 544.

In the absence of controlling authority, Ellis suggests that *Riley v. California*, —— U.S. ——, 134 S.Ct. 2473, 2489–90, 189 L.Ed.2d 430 (2014), should be extended to recognize a protected privacy interest in the use and location of cell phones. The Court in *Riley* held that a warrant is generally required to search the information

on a cell phone, recognizing the privacy interests in the kinds of data stored on or accessed through modern cell phones, but did not go so far as to hold that the Fourth Amendment protects the use or location of a cell phone in real time.

The storage capacity of cell phones has several interrelated consequences for privacy. First, a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone.

Finally, there is an element of pervasiveness that characterizes cell phones but not physical records. ... According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower.... [I]t is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate....

Although the data stored on a cell phone is distinguished from physical rec-

ords by quantity alone, certain types of data are also qualitatively different.... Data on a cell phone can also reveal where a person has been....

*Riley,* 134 S.Ct. at 2489–90 (footnote and citations omitted). Though this discussion is instructive, *Riley* did not recognize a protected privacy interest in one's cell phone use or location.

On a related issue, several judges in this district have recognized a right to privacy in historical cell site location information ("CSLI") that is collected by cellular service providers. CSLI is generated by the radio signals emanated by a cell phone to the closest cell tower in the cellular service network, as described more fully by Judge Koh in *In re Application for Telephone Information Needed for a Criminal Investigation,* 119 F.Supp.3d 1011, 1013–15 (N.D. Cal. 2015), No. 15–xr–90304 HRL (LHK), doc. no. 30, *appeal dismissed* (Feb. 5, 2016). "The resulting CSLI includes the precise location of the cell tower and cell site serving the subject cell phone during each voice call, text message or data connection," and may be generated even without the user's interaction with the cell phone. *Id.* at 1014 (citations omitted).

Judge Illston addressed the privacy interests in such information in *United States v. Cooper,* 2015 WL 881578 (N.D. Cal., Mar. 2, 2015), No. 13–cr–693 SI, doc. no. 117. There, the defendant moved to suppress evidence obtained from collecting historical and prospective, or real-time, cell site location information without a warrant. Judge Illston recognized that cell phone users have a reasonable expectation of privacy in their physical location as conveyed by historical CSLI that is protected by the Fourth Amendment. *Id.* at *6–11 (citing *United States v. Davis,* 754 F.3d 1205, 1215 (11th Cir.), *vacated,* 573 Fed.Appx. 925 (11th Cir. 2014), *and reheard en banc in part,* 785 F.3d 498 (11th Cir. 2015)). Judge Illston did not reach the

Fourth Amendment issue with respect to prospective CSLI, but held, as further discussed below at pp. 1148–49, that by application of the Communications Assistance of Law Enforcement Act ("CALEA"), 47 U.S.C. § 1002(a)(2), the pen register statute did not authorize access to call-identifying information from telecommunications carriers that may disclose the subscriber's physical location, and that a showing of probable cause was required to obtain prospective cell site data. *Id.* at *3–6. Although the government had not obtained a warrant, the court denied the motions to suppress upon finding that the agents relied in good faith on the magistrate judge's order authorizing a pen register. *Id.* at *11–12.

Judge Koh also held that cell phone users have a reasonable expectation of privacy in historical CSLI, requiring a warrant to obtain such information absent case-specific exceptions. *In re Appl. for Tel. Info.,* 119 F.Supp.3d at 1025–26. There, the government submitted an application to Magistrate Judge Lloyd for an order authorizing it to obtain both historical and prospective CSLI for target cell phones pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. § 2703(d), which sets forth a "specific and articulable facts" standard that requires a lesser showing than probable cause. Following *Cooper,* Magistrate Judge Lloyd denied the application and required the government to obtain a search warrant to obtain cell site information, whether historical or prospective. No. 15–xr–90304 HRL (LHK), doc. no. 2.

The government appealed Magistrate Judge Lloyd's denial with respect to the application for historical CSLI. In affirming that decision, Judge Koh articulated several Fourth Amendment principles based on Supreme Court precedent:

(1) an individual's expectation of privacy is at its pinnacle when government surveillance intrudes on the home; (2) long-term electronic surveillance by the government implicates an individual's expectation of privacy; and (3) location data generated by cell phones, which are ubiquitous in this day and age, can reveal a wealth of private information about an individual.

*In re Appl. for Tel. Info.*, 119 F.Supp.3d at 1022. Applying those principles to the government's application for historical CSLI, Judge Koh determined that the information sought by the government was arguably more invasive of an individual's expectation of privacy than the GPS device attached to the defendant's car in *Jones*, noting that when the government uses CSLI data to obtain information about one's location and movements, (1) "an individual will invariably enter constitutionally protected areas, such as private residences" and (2) the government would "get more information, more data points, on the cell phone via historical CSLI" compared to GPS tracking of a car, because cell phones typically accompany the user wherever she goes. *Id.* at 1023 (internal marks omitted). Applying the *Katz* test, Judge Koh considered evidence demonstrating that individuals have a subjective expectation of privacy in the historical CSLI associated with their cell phones, and determined that society is prepared to recognize that expectation as objectively reasonable, citing state court decisions recognizing a reasonable expectation of privacy in CSLI. *Id.* at 1024–26. Upon determining that the third party doctrine did not defeat that reasonable expectation of privacy, and that no exception to the warrant requirement was applicable, Judge Koh held that the Fourth Amendment requires the government to secure a warrant to obtain historical CSLI. *Id.* at 1040.

In *United States v. Williams, et al.*, 2016 WL 492934 (N.D. Cal. Feb. 9, 2016), No. 13–cr–764 WHO, doc. no. 874, Judge Orrick followed *In re Application for Telephone Information* and *Cooper* to recognize a reasonable expectation of privacy in one's historical CSLI, requiring probable cause to obtain the historical CSLI from the four moving defendants' cell phones. Having determined that the government submitted several applications pursuant to the SCA under the lower "specific and articulable facts" standard rather than the probable cause standard, Judge Orrick held that the good faith reliance exception applied and denied the motions to suppress.[1] 2016 WL 492934 at *2.

On the specific issue presented here whether using a Stingray to locate a cell phone amounts to a search, the district court for the Southern District of New York held that the DEA's use of a CSS to locate a defendant's apartment "was an unreasonable search because the 'pings' from [the defendant's] cell phone to the nearest cell site were not readily available 'to anyone who wanted to look' without the use of a cell-site simulator." *United States*

---

1. By separate order, doc. no. 873, Judge Orrick granted another defendant's motion to suppress historical CSLI obtained under a warrant, which the court determined was not supported by probable cause, having recognized a reasonable expectation of privacy in one's historical CSLI. *United States v. Williams*, 161 F.Supp.3d 846, 850–57 (N.D. Cal.) (order granting A. Gilton's motion to suppress cell phone data) (citing *In re Appl. for Tel. Info.* and *Cooper*), *appeal docketed*, No. 16–10109 (9th Cir. March 11, 2016). The Ninth Circuit recently withdrew submission of the appeal from the suppression order pending the Supreme Court's decision in *Carpenter v. United States*, No. 16–402, which presents the question whether warrantless search and seizure of historical cell phone records revealing the location and movements of cell phones is permitted under the Fourth Amendment. *Williams*, CR 13–cr–764 WHO, doc. no. 1194.

v. Lambis, 197 F.Supp.3d 606, 610 (S.D.N.Y. 2016) (quoting Knotts, 460 U.S. at 281, 103 S.Ct. 1081), appeal withdrawn (Mar. 13, 2017). The court in Lambis rejected the government's contention that there was no reasonable expectation of privacy under the third party doctrine, reasoning that the location information detected by a cell-site simulator is "neither initiated by the user nor sent to a third party," unlike pen register information that is conveyed to a telephone company or cellular provider. 197 F.Supp.3d at 614–15. See also State v. Andrews, 227 Md.App. 350, 393, 134 A.3d 324 (2016) (holding that people have a reasonable expectation of privacy in real-time cell phone location information, and requiring a search warrant to use a CSS); State v. Tate, 357 Wis.2d 172, 849 N.W.2d 798 (2014) (assuming, without deciding, that use of a Stingray amounted to a Fourth Amendment search requiring a warrant, and holding that the pen register order was sufficiently particularized and based on probable cause).

The government relies on recent circuit court decisions that tracking cell site location information from phone companies is not a search because there is no reasonable expectation of privacy in information shared with cellular service providers under the third party doctrine. United States v. Graham, 824 F.3d 421, 435–38 (4th Cir. 2016) (en banc), pets. for cert. filed sub nom Graham v. United States, No. 16–6308 (Sept. 26, 2016) and Jordan v. United States, No. 16–6694 (Oct. 27, 2016); United States v. Carpenter, 819 F.3d 880, 888 (6th Cir. 2016), cert. granted sub nom Carpenter v. United States, —— U.S. ——, 137 S.Ct. 2211, 198 L.Ed.2d 657 (2017). Distinguishing these cases, the court in Lambis reasoned that unlike CSLI obtained by the wireless carriers, CSS technology has "an additional layer of involuntariness" that renders the third party doctrine inapplicable:

Unlike CSLI, the "pings" picked up by the cell-site simulator are not transmitted in the normal course of the phone's operation. Rather, "cell site simulators actively locate phones by forcing them to repeatedly transmit their unique identifying electronic serial numbers, and then calculating the signal strength until the target phone is pinpointed."

Lambis, 197 F.Supp.3d at 615 (quoting Andrews, 227 Md.App. at 359 n.4, 134 A.3d 324). The court in Lambis also determined that unlike pen register information or CSLI, "a cell-site simulator does not involve a third party." Id. at 616. "With the cell-site simulator, the Government cuts out the middleman and obtains the information directly." Id. See also Patrick, 842 F.3d at 543 (noting that by using CSS technology, "law-enforcement officials get the same sort of information that a phone company could provide using its own facilities, and they get it in real time rather than waiting for the phone company to turn over data"). For the reasons articulated in Lambis, the circuit court decisions applying the third party doctrine to historical CSLI are inapposite.

■ The court adopts Judge Koh's reasoning in In re Application for Telephone Information, 119 F.Supp.3d at 1026, to hold that cell phone users have an expectation of privacy in their cell phone location in real time and that society is prepared to recognize that expectation as reasonable. While Judge Koh limited her analysis to the privacy interest in historical CSLI, the court determines that cell phone users have an even stronger privacy interest in real time location information associated with their cell phones, which act as a close proxy to one's actual physical location because most cell phone users keep their phones on their person or within reach, as the Supreme Court recognized in Riley. In light of the persuasive authority of Lam-

bis, and the reasoning of my learned colleagues on this court recognizing a privacy interest in historical cell site location information, the court holds that Ellis had a reasonable expectation of privacy in his real-time cell phone location, and that use of the Stingray devices to locate his cell phone amounted to a search requiring a warrant, absent an exception to the warrant requirement.

### d. Privacy Interest in One's Public Movements

Ellis further argues that because a Stingray can track an individual's location by locating his cell phone with an accuracy of about two meters, its use infringed upon his reasonable expectation of privacy in one's public movements, as considered by Justice Sotomayor in her concurring opinion in *Jones*: "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations....I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one's public movements." Doc. no. 304 at 16 (citing *Jones*, 565 U.S. at 415–16, 132 S.Ct. 945 (Sotomayor, J., concurring)). The Court in *Jones* did not reach the question whether the Fourth Amendment protects a privacy interest in one's public movements, and even Justice Sotomayor did not attempt to resolve these "difficult questions" because "the Government's physical intrusion on Jones' Jeep supplies a narrower basis for decision." *Id.* at 418; 132 S.Ct. 945. Accordingly, Ellis fails to establish that a reasonable expectation of privacy in one's public movements that is protected under the Fourth Amendment has been recognized by any court.

### B. Pen Register Procedures

The government argues that even if use of the Stingray devices amounted to a search, the search was reasonable because it was conducted pursuant to the emergency provisions of the pen register statute, in combination with provisions of the Stored Communications Act. The government further argues that a warrant was not required to conduct the search pursuant to the exception for exigent circumstances, and that the exceptions to the exclusionary rule for good faith reliance and/or inevitable discovery are also applicable.

The pen register statute and the SCA set forth different standards to authorize different methods of electronic surveillance. The provisions for authorizing a pen register and/or a trap and trace device under Title III of the Electronic Communications Privacy Act of 1986 ("ECPA"), codified as amended at 18 U.S.C. §§ 3121–3127 (referred to throughout as the "pen register statute"), require a government attorney merely to "certify" the relevance of the information likely to be obtained, without requiring a factual basis for the certification. 18 U.S.C. §§ 3122 and 3123 (requiring the court to enter "an ex parte order authorizing the installation and use of a pen register or trap and trace device anywhere within the United States, if the court finds that the attorney for the Government has certified to the court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation"). The SCA, enacted under Title II of the ECPA, as amended, provides that the government may require a provider of electronic communication service or remote computing service to disclose a subscriber's records, without the contents of communications, by obtaining either (A) a warrant, or (B) a court order upon a showing of "specific

and articulable facts showing...reasonable grounds to believe that...the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. §§ 2703(c)(1) and (d). The "specific and articulable facts" standard under the SCA requires a higher showing than the certification required by the pen register statute, but does not require probable cause.

Under the emergency provisions of the pen register statute, a law enforcement officer who reasonably determines that an emergency situation exists may have a pen register or trap and trace device installed without a prior court order only if an order approving the installation or use is issued within forty-eight hours after the installation has occurred, or begins to occur. 18 U.S.C. § 3125. The provision for "Emergency Pen Register And Trap And Trace Device Installation" narrowly defines a covered "emergency" to involve specific circumstances, two of which the government asserts authorized the use of the emergency provisions here: (A) immediate danger of death or serious bodily injury to any person; and (B) conspiratorial activities characteristic of organized crime. 18 U.S.C. §§ 3125(a)(1)(A) and (B). The officers' sworn statements, including affidavits filed under seal in this case, establish that the OPD had reason to believe that there was an emergency where (A) the immediate safety of officers and/or public citizens was at risk and (B) the emergency involved the conspiratorial activities of organized crime, based on information that Ellis was a known member of a gang who was involved in an attempted murder at a bus stop on January 20, who was near the shooting of a police officer earlier that evening on January 21, and who was believed to be in possession of guns.

It is undisputed that the OPD and FBI did not seek issuance of a search warrant to operate the Stingray devices, but only

obtained an order authorizing pen register and/or trap and trace devices (the "pen register order"). Here, the state court judge issued an order pursuant to both the SCA and the pen register statute ("18 United States Code Section 2703(c)(d), 3122, 3123") requiring the service providers to provide the FBI and the OPD with pen registers "to register numbers dialed or pulsed[,] to record the date and time[,] to record the length of time[,] and to receive cell site and/or location sites," as well as trap and trace devices, for the target phone number which the application demonstrated was used by Ellis. Doc. no. 321, Ex. F. The court order also required the wireless carriers to provide, "on an ongoing and/or real-time basis, the location of cell site/sector (physical address) at call origination (for outbound calls), call termination (for incoming calls), and, during the progress of a call, the direction and strength of a signal" for the target phone. The government does not contend that the order authorizing the use of pen register and/or trap and trace devices here was supported by a finding of probable cause. The pen register order does not make a probable cause finding, but only a finding of "specific and articulable facts establishing reasonable grounds to believe the listed records are relevant and material to an ongoing criminal investigation" pursuant to the SCA, 18 U.S.C. §§ 2703(c)(1)(B) and (d). Doc. no. 321, Ex. F.

Ellis contends that the pen register order was not sufficient to authorize the use of the Stingray devices, which required a warrant. As an initial matter, Ellis challenges the government's factual assertion that the Stingrays were configured as pen registers and/or trap and trace devices, doc. no. 321 at 9 and Exs. G–J, given that Stingrays also have the capability of intercepting the content of communications, not just information about numbers dialed in or dialed out. Doc. no. 324 at 3. *See* 18

U.S.C. § 3127(3) and (4) (defining pen register as a device which "records or decodes dialing, routing, addressing, or signaling information" transmitted by the target phone on outgoing calls, and a trap and trace as a device which captures information from incoming calls made to the target phone, but not contents of any communication). Although Ellis seeks supporting evidence about how the specific Stingray devices were configured and the capabilities of each device, the sworn affidavits of the OPD and FBI agents are sufficient to establish that the Stingrays used here were configured as pen registers and/or trap and trace devices and were not capable of capturing any content. Doc. no. 321 at 9 and Exs. G–J. There is no evidence in the record suggesting that the Stingrays captured the content of any communications, and an evidentiary hearing to determine the mechanical details about the Stingray devices is not warranted.

Ellis further argues that even if the government had obtained a search warrant authorizing the use of the Stingrays, the warrant would be invalid for lack of particularity because a cell site simulator is capable of collecting information from anyone's phone that was within range. Doc. no. 304 at 19. He suggests that the FBI and OPD used the Stingrays to monitor potentially hundreds of individuals' phone calls. Id. at 22. This is a purely speculative argument given the sworn affidavits of the Stingray operators stating that the devices were configured to look for the phone number that belonged to Ellis. Doc. no. 321, Exs. G ¶ 8 (OPD officer) and I ¶ 10 (FBI agent). There is no evidence to suggest that Stingrays were set up to sweep all cell phones in the area, and such a configuration would be inconsistent with the purpose for using the Stingrays, which was to find Ellis by locating his cell phone.

The government contends that since the Stingray devices used in this case were configured in compliance with the pen register statute, then the provisions of the pen register statute, including the "emergency" provisions, govern their operation. Doc. no. 321 at 9 (citing 18 U.S.C. § 3125). The government does not address the key issue in dispute, namely, whether the provisions of the pen register statute and the SCA provide the appropriate standard for using a CSS to locate a cell phone in real-time. The court follows Judge Illston's determination in *Cooper*, 2015 WL 881578, that the provisions of the pen register statute and the SCA do not authorize the use of a CSS to disclose real-time information about a cell phone user's physical location, and that such location monitoring must be authorized by a showing of probable cause.

In *Cooper*, the government collected both historical and prospective CSLI from Metro PCS pursuant to orders authorizing pen register, trap and trace, and cell site data, without the use of Stingrays or similar devices, and the defendant challenged the failure to show probable cause to obtain cell site data. With respect to obtaining prospective CSLI, the government argued in *Cooper* that it was not required to show probable cause but only needed to satisfy the provisions of the pen register statute, 18 U.S.C. § 3123, and the SCA, 18 U.S.C. § 2703(d).

With respect to real time CSLI, Judge Illston held that under the CALEA, which amended the ECPA, the government is prohibited from relying solely on the provisions of the pen register statute to obtain cell site data that discloses the physical location of the subscriber. *Cooper*, 2015 WL 881578 at *3 (citing 47 U.S.C. § 1002(a)(2)(B) ("with regard to information acquired solely pursuant to the authority for pen registers and trap and trace devices [ ], such call-identifying information shall not include any information

that may disclose the physical location of the subscriber)). Judge Illston noted that the CALEA did not explicitly establish a standard for obtaining cell site data, and applied the "default" probable cause standard of Rule 41 of the Federal Rules of Criminal Procedure. *Id.* (citations omitted). *See* Fed. R. Crim. P. 41(d)(1) ("After receiving an affidavit or other information, a magistrate judge—or if authorized by Rule 41(b), a judge of a state court of record—must issue the warrant if there is probable cause to search for and seize a person or property or to install and use a tracking device."). Judge Illston rejected the government's hybrid theory that combining the SCA with the pen register statute to obtain prospective cell site data would comply with the CALEA, reasoning that Congress intended that the SCA "was to be used as a means to obtain data which has **already been stored** at the time the government seeks to obtain it," as opposed to real-time data. *Cooper*, 2015 WL 881578 at *4–5 (emphasis added).

Here, the government has provided declarations stating that the OPD and FBI configured the Stingray devices to locate the target cell phone, not broadly tracking all cell phone signals in the apartment building, making the Stingray use here similar to use of a beeper that was tracked inside a home, as in *Karo*, 468 U.S. at 715, 104 S.Ct. 3296 ("the monitoring indicated that the beeper was inside the house, a fact that could not have been visually verified"). Given the undisputed fact that the Stingray devices were configured to locate Ellis's cell phone, the court adopts Judge Illston's reasoning in *Cooper* to hold that by application of 47 U.S.C. § 1002(a)(2), the pen register statute in combination with the SCA does not authorize obtaining cell phone location information through pen register or trap and trace devices, and that a warrant supported by a showing of probable cause is required to use a Stingray to locate a cell phone. The court

further holds that the "specific and articulable facts" standard under the SCA does not govern the use of a Stingray on the separate ground that the SCA authorizes the disclosure of communications or records kept by third party service providers, not direct surveillance of cell phone location by the government.

The government raises a cursory argument that the search of Ellis's cell phone location information was a valid probation search, contending that the more intrusive search of the contents of his cell phone was valid under the four-way search condition of his probation. Doc. no. 321 at 16 (citing 10/29/15 Order, hereby designated "Pretrial Order No. 2," at 19). The government cites no authority for this proposition, given that the privacy interest in one's cell phone location, which could be a proxy for one's personal location, is more akin to the privacy interests against GPS tracking or GPS monitoring, which was not a condition of Ellis's probation.

Accordingly, the warrantless searches were unreasonable, unless the exigent circumstances exception to the warrant requirement applies. If the court finds that no exception to the warrant requirement applies, the government seeks an exception from the exclusionary rule for good faith reliance or inevitable discovery.

### C. Exception to Warrant Requirement for Exigent Circumstances

█ The government argues that if a warrant was required to use a Stingray to locate a cell phone, the warrantless searches here were reasonable due to exigent circumstances which relieved law enforcement of the warrant requirement. Doc. no. 321 at 10 (citing *Kentucky v. King*, 563 U.S. 452, 460, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) and *Murdock v. Stout*, 54 F.3d 1437, 1441 (9th Cir. 1995), *abrogated on other grounds by United*

*States v. Ramirez*, 523 U.S. 65, 69–70, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998)). The government identifies several factors known to law enforcement to demonstrate exigent circumstances at the time the OPD and FBI deployed the Stingrays:

 i. Ellis was identified by an eyewitness as the get-away driver in an attempted murder on January 20, 2013;

 ii. The same eyewitness identified the license plate number of the car Ellis was driving, and that car was located in the rear lot of the apartment building where Ellis lived;

 iii. The next day, an Oakland police officer investigating the get-away car was attacked, beaten, and shot while Ellis stood in the driveway of the apartments;

 iv. Ellis was in the driveway when the assault occurred;

 v. The guns stolen from the officer were in Ellis's room;

 vi. In the days immediately preceding the shooting, Ellis was in possession of a large number of firearms;

 vii. Ellis was a known member of a gang with a violent history; and

 viii. Ellis lived at the 1759 Seminary Apartment complex, but officers did not know his location.

Doc. no. 321 at 8. Having reviewed the affidavits in the record, including the unredacted search warrant affidavits and pen register application filed ex parte under seal, the court determines that these circumstances were known to OPD officers by the early morning of January 22, 2013, when the first Stingray was deployed. See doc. no. 321, Ex. M (under seal). Ellis disputes the government's factual assertions (iii) and (iv) suggesting that he was involved in the assault and shooting of the OPD officer. Doc. no. 324 at 2. Officer Saunders' redacted pen register application indicates, however, that B.O.T., known

to be Ellis, was "in the driveway when the shooting happened." Doc. no. 304, Ex. I.

 Under the exigency exception to the warrant requirement, officers may make a warrantless search if: (1) they have probable cause to believe that the item or place to be searched contains evidence of a crime, and (2) they are facing exigent circumstances that require immediate police action. *United States v. Camou*, 773 F.3d 932, 940 (9th Cir. 2014). Exigent circumstances are defined as " 'those circumstances that would cause a reasonable person to believe that entry [or search]...was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " *Id.* (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc), *overruled on other grounds by Estate of Merchant v. Comm'r*, 947 F.2d 1390, 1392–93 (9th Cir. 1991)). "To be reasonable, a search under this exception must be limited in scope so that it is 'strictly circumscribed by the exigencies which justify its initiation.' " *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)).

Ellis disputes that any exigencies justified use of the Stingrays without a warrant sometime after 2:11 a.m., where earlier that evening, by 8:45 p.m., Ellis and other suspects had already been determined to be in the apartment building which had been surrounded by the SWAT team "to contain any suspects." Doc. no. 324, Ex. C. Ellis also points out that the officers had time to apply for and obtain three separate search warrants late at night and into the morning, particularly the warrant to search Apartments 108, 110 and 112, which Judge Horner issued at 1:05 am, indicating that the situation did not prevent the OPD and FBI from seeking court authorization

to use the Stingrays. Doc. no. 324 at 7; doc. no. 321, Ex. B (search warrant).

Because the OPD and FBI proceeded on the premise that the Stingrays were subject to the emergency provisions of the pen register statute, rather than a warrant requirement, the government contends that the officers followed the statutory procedures by securing an order authorizing use of the Stingray devices within 48 hours of using the device. Doc. no. 321 at 9–10 (citing 18 U.S.C. § 3125). The order was issued on January 22, 2013, the same day the Stingrays were used, although the exact time the order was issued is not known.

The government argues that exigent circumstances excused the requirement to obtain a warrant to locate Ellis's cell phone, but Ellis responds that he was not known to have assaulted or directly threatened violence against the victim in either of the shootings. The record demonstrates, however, that Ellis was a known suspect involved as a getaway driver in the January 20 shooting and was near the January 21 shooting in the driveway. Though Ellis was not known to be the shooter, he was believed to be a suspect in possession of firearms. The need to prevent escape by a suspect presented exigent circumstances here. *McConney*, 728 F.2d at 1199. Although Ellis was not involved in an armed standoff situation, the timeline of events and the facts presented in the unredacted pen register application demonstrate that law enforcement officers on the scene believed that any unnecessary delay in finding Ellis would endanger their lives or the safety of others and/or that speed was essential to prevent his escape. *See Fisher v. City of San Jose*, 558 F.3d 1069, 1075 (9th Cir. 2009) (en banc) (where exigent circumstances justified seizure of the suspect who was seen pointing a rifle at police officers, loading his rifles, and arranging them strategically throughout his apartment to repel any entry by the police, police were not required to obtain an arrest warrant to take the suspect into full physical custody over twelve hours later).

The declarations and documents in support of the government's opposition, doc. no. 321, indicate the following sequence of events on the night of January 21 to January 22, 2013, as cited below.

9:00 pm At about 9:00 pm, the Stingray operator for the OPD arrived at the scene, and helped deploy the SWAT robots soon after arriving. Ex. G ¶ 10.

10:41 pm Police held a perimeter on the apartment building at 1759 Seminary, and continued to search nearby houses, roofs, yards and a creek. 8/17/15 Order at 9.

11:15 pm OPD prepared an Exigent Circumstance Request to MetroPCS asking for call detail records, cell sites and pen register information for Ellis's cell phone number. Ex. A.

11:55 pm Officers end the yard search and focus on 1759 Seminary. 8/17/15 Order at 9.

1:05 am Judge Horner signed the warrant authorizing the search of Apartments 108, 110, and 212. Ex. B.

1:47 am OPD starts making announcements for "everyone to stay away frm windows," and preparing to send bean bags into Apartment 212. Doc. no. 304, Ex. M (CAD reports).

2:11 am OPD Officer Saunders faxed a Pen Worksheet for Ellis's number to Metro PCS, asking to "start pen register if phone is active and being used," implying that the pen register had not yet been provided. Ex. C. Sometime after that request was

faxed, OPD obtained the pen register information and deployed the Stingray. Ex. G ¶¶ 11, 12 (indicating the OPD Stingray operator did not begin operating the Stingray until after OPD obtained the pen register information from the telephone provider, and began operating the Stingray sometime after midnight in the early hours).

3:41 am OPD searched Apartment 212, finding both handguns taken from Officer K. plus a third pistol, and keys to the white Dodge Avenger getaway car from the January 20 daytime shooting. 8/17/15 Order at 10.

7:00 am At approximately 7:00 am, the FBI Stingray operator was notified that OPD requested assistance from the FBI in the use of its cell site simulator. Ex. I ¶ 8.

7:30 am The FBI sent MetroPCS an Exigent Circumstances Request for pen register information on Ellis's phone. Ex. D; Ex. I ¶ 9.

9:00 am The FBI Stingray operator arrived at the scene. Ex. I ¶ 10.

10:00 am OPD powered off its Stingray and purged the data, and the FBI began operating its Stingray. Ex. G ¶ 13, 15; Ex. I ¶ 10. The FBI Stingray was operated for about one hour before Ellis's phone was located. Ex. I ¶ 10.

10:52 am Apartment 112 was cleared, and Ellis and the other occupants were escorted out. Ex. L (radio purge excerpt)

Ellis suggests that OPD had sufficient time to obtain a warrant to deploy the Stingrays as demonstrated by the issuance of the search warrant for Apartments 108, 110 and 212 in the early hours of January 22. To explain why a warrant or pen register order was not obtained before deploying the Stingrays, the government has demonstrated that OPD proceeded under the emergency pen register procedures and that OPD otherwise would have needed to wait until normal business hours to submit a pen register order to MetroPCS. Doc. no. 321, Ex. K. Indeed, it is worth noting that the factual basis for demonstrating probable cause for issuance of the warrant authorizing the search of Ellis's apartment would have likely been found to support probable cause for the OPD to use the Stingray device to locate Ellis by locating his cell phone, if a separate warrant had been sought, based on the showing of a fair probability that evidence of a crime would be found. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See* doc. no. 307, Ex. E (search warrant affidavit sworn at 1:05 a.m. on 1/22/2013).

Ellis also suggests that there was no exigency requiring a warrantless search to prevent flight and to prevent harm to the officers and others because OPD knew that Ellis was somewhere inside the apartment building, rather than outside where police had conducted a search of nearby houses and yards. However, OPD obtained a warrant to search Ellis's residence, Apartment 212, and he was not there, leaving the entire building to remain under siege all night as OPD continued to look for Ellis. Under these circumstances, the use of the Stingray by OPD to locate Ellis's cell phone was justified by exigent circumstances, based on risk of flight and the belief that Ellis was in possession of firearms. The FBI's use of the second Stingray device was a continuation of the OPD's initial search for Ellis's cell phone location. *See Fisher*, 558 F.3d at 1077–78 ("officers were not required to periodically reassess whether the exigency persisted throughout the standoff because the standoff was 'no more than an actual continuation' of the actual seizure" and the exigent circumstances did not materially change)

(citing *Michigan v. Tyler*, 436 U.S. 499, 511, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (warrantless entry into burning building to extinguish fire and conduct search to determine its cause was justified by exigency, and warrantless post-fire search four hours later, despite the absence of exigent circumstances, was upheld as a continuation of the initial search); *United States v. Echegoyen*, 799 F.2d 1271, 1280 (9th Cir. 1986) (where exigent circumstances justified initial warrantless entry, subsequent entry by narcotics officers to inspect the premises for a possible fire hazard was merely a continuation of the initial lawful entry because both were done to alleviate the exigent circumstances)). *Cf. Michigan v. Clifford*, 464 U.S. 287, 296, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (post-fire search for evidence of arson "was not a continuation of an earlier search" where the homeowners made a reasonable effort to secure their fire-damaged home after the blaze was extinguished and the fire and police units left the scene about six hours earlier, distinguishing *Tyler*).

Accordingly, the court determines that a warrant was not required to deploy the Stingrays to locate Ellis's cell phone under the exigent circumstances that existed the morning of January 22, 2013. Ellis's motion to suppress evidence obtained from use of the Stingrays is therefore DENIED.

Notwithstanding this determination, the court proceeds to consider the exceptions to the exclusionary rule for good faith reliance and/or inevitable discovery asserted by the government as separate grounds for denying the motion to suppress.

## D. Exceptions to Exclusionary Rule

### 1. Good Faith Reliance

The government argues that even if a warrant had been required to authorize the use of the Stingrays, the OPD officers and FBI agents reasonably relied in good faith on the pen register order, issued under the emergency procedures of the pen register statute, 18 U.S.C. § 3125, to use the Stingrays to locate Ellis's cell phone.

The "good faith" exception to the exclusionary rule established by *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is satisfied if an officer acts "in objectively reasonable reliance" on a defective warrant. *See United States v. Underwood*, 725 F.3d 1076, 1084 (9th Cir. 2013). "To determine whether the officer acted in objectively reasonable reliance, 'all of the circumstances—including whether the warrant application had previously been rejected by a different magistrate—may be considered.'" *Id.* (citing *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. 3405; *Messerschmidt v. Millender*, 565 U.S. 535, 132 S.Ct. 1235, 1249–50, 182 L.Ed.2d 47 (2012)). The burden of demonstrating good faith rests with the government. *Id.*

The Court in *Leon* identified four situations that per se fail to satisfy the good faith exception: (1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing judge; (2) where the judge "wholly abandon[s] his [or her] judicial role"; (3) where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" (in other words, a "bare bones" affidavit); and (4) where the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Underwood*, 725 F.3d at 1085 (citing *Leon*, 468 U.S. at 922–23, 104 S.Ct. 3405) (internal quotation marks omitted). "In these situations, 'the officer will have no reasonable grounds for believing that the warrant was

properly issued.'" *Id.* (quoting *Leon*, 468 U.S. at 922–23, 104 S.Ct. 3405).

■■ Ellis argues that any good faith reliance argument is foreclosed by the fact that Officer Saunders's application failed to disclose to the issuing judge that the OPD and FBI planned to use the Stingray devices, rather than more traditional pen register and trap and trace methods. Ellis points out that the pen register application does not, on its face, seek authorization to use a Stingray. Doc. no. 324 at 4–5. Under Ninth Circuit authority, however, the particular means of executing a warrant need not be specifically authorized, though it is subject to judicial review for reasonableness if challenged. *United States v. Chen*, 979 F.2d 714, 720 (9th Cir. 1992) (following *Dalia v. United States*, 441 U.S. 238, 258–59, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) ("It would extend the Warrant Clause to the extreme to require that, whenever it is reasonably likely that Fourth Amendment rights may be affected in more than one way, the court must set forth precisely the procedures to be followed by the executing officers.")). In *Dalia*, the Court held that the Fourth Amendment requires that search warrants must be issued by neutral, disinterested magistrates; that those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense; and that warrants must particularly describe the things to be seized, as well as the place to be searched, but do not require "a specification of the precise manner in which they are to be executed." *Dalia*, 441 U.S. at 255, 257, 99 S.Ct. 1682 (citations and internal marks omitted). *See Patrick*, 842 F.3d at 544 ("neither constitutional text nor precedent suggests that 'search warrants also must include a specification of the precise manner in which they are to be executed'") (citing *Richards v. Wisconsin*, 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997)

and *Dalia*, 441 U.S. at 256, 99 S.Ct. 1682). In light of this authority, it was reasonable for Officer Saunders not to disclose the particular manner of execution in his application for a pen register order authorizing location information for Ellis's cell phone, including cell site/sector location and "direction and strength of a signal" for his telephone number.

Ellis also challenges the pen register order on the ground that the order authorizing use of the devices for a period of 30 days from the date of the order could not have authorized the use of any device before the order was signed on January 22, 2013, but the government has explained that the statutory provisions for emergency pen register applications permit such post hoc authorization. 18 U.S.C. § 3125. Ellis further challenges the pen register order because the government has failed to produce the original, but the lack of an original does not warrant suppression in light of other evidence in the record demonstrating that the pen register order was issued by Judge Horner.

Here, there are no indicia of bad faith where the Stingray operators have attested that the OPD and FBI configured the Stingrays as pen registers, without capturing any content of communications, and sought authorization under the pen register statute in combination with the SCA. The government points out that under then-existing FBI policy, a warrant was not required before using a cell site simulator. *See* doc. no. 304 Ex. B (FBI Electronic Surveillance Manual at 41). The excerpt of a manual cited by Ellis further instructed that cell site simulators were covered by the definition of a pen register in 18 U.S.C. § 3127(3) as amended by the USA Patriot Act of 2001, Pub.L. 107–56, October 26, 2001, 115 Stat. 272. Doc. no. 304, Ex. O (USABook). That DOJ policy has since been amended, effective Septem-

ber 3, 2015, to require a warrant to operate a CSS. *See Lambis*, 197 F.Supp.3d at 611.

At the time the CSS technology was used in this case, there was no controlling authority as to whether its use constituted a search requiring issuance of a warrant. In this district, Judge Illston's unpublished decision in *Cooper*, 2015 WL 881578, requiring a showing of probable cause to obtain prospective cell site location information, was not issued until two years after the Stingrays were used in this case in January 2013.

On the other hand, there is out-of-district authority indicating that prior to 2013, the government applied for tracking warrants within this district, supported by a showing of probable cause, to use mobile tracking devices that acted like cell site simulators. In *Rigmaiden*, the government obtained a tracking warrant in this district issued in 2008 by then-Magistrate Judge Seeborg to use a mobile tracking device which functioned as a cell site simulator to locate the defendant's aircard. *United States v. Rigmaiden ("Rigmaiden I")*, 844 F.Supp.2d 982, 995 (D. Ariz. 2012) ("The mobile tracking device mimicked a Verizon Wireless cell tower and sent signals to, and received signals from, the aircard."). The government conceded there, for purposes of the defendant's requests for discovery related to his suppression motions, that the aircard tracking operation was a Fourth Amendment search and seizure and that the government would rely on the Rule 41 tracking warrant, application, and affidavit to authorize the use of the tracking device to communicate directly with the defendant's aircard and determine its location. *Id.* at 996 (citing *In re Application of the US for an Order Authorizing the Use and Monitoring of a Mobile Tracking Device*, 890 F.Supp.2d 747 (N.D. Cal.)). After conducting an ex parte hearing, and in light of the government's factu-

al admissions and concessions, the Arizona district court denied the defendant's motions for disclosures and additional discovery. *See id.* at 1005 ("The Court concludes that Defendant has ample information with which to construct his Fourth Amendment arguments."). The court subsequently denied Rigmaiden's motion to suppress evidence with respect to the FBI's use of the mobile tracking device after determining that the tracking warrant was supported by probable cause. *United States v. Rigmaiden ("Rigmaiden II")*, 2013 WL 1932800 (D. Ariz. May 8, 2013). The court in *Rigmaiden II* initially determined that the defendant did not have a reasonable expectation of privacy in the aircard that was obtained through fraud. 2013 WL 1932800 at *6–9. The Arizona district court did not, however, reach the issue whether use of a CSS required a warrant even if there was a protected privacy interest because the government conceded that use of a CSS-type mobile tracking device to track the aircard was a Fourth Amendment search and relied on a warrant, which the court found was supported by probable cause and sufficient particularity.

Prior to 2013, the few out-of-district courts presented with the question whether law enforcement was required to obtain a warrant or a pen register/trap and trace order to operate a cell site simulator, or similar device, issued differing opinions. *Compare In re Application of the U.S. for an Order Authorizing Use of a Cellular Telephone Digital Analyzer ("In re Appl. Digital Analyzer")*, 885 F.Supp. 197, 202 (C.D. Cal. 1995) (holding that no court order is required for law enforcement agents to use a digital analyzer to detect only the electronic serial number and phone number of the subject cellular telephone and the numbers being called, but, to the extent an order could be fashioned, requiring certain provisions analogous to an order authorizing a pen register and

trap and trace device pursuant to 18 U.S.C. § 3123(b)) *with In re Application of the U.S. for an Order Authorizing the Installation & Use of a Pen Register & Trap & Trace Device*, 890 F.Supp.2d 747, 748 (S.D. Tex. 2012) (denying application for order authorizing the installation and use of a pen register and trap and trace device to operate "stingray" in the absence of authority that pen register statute, rather than warrant requirement, applies to stingray equipment) (citing *In re Appl. Digital Analyzer* ).

In determining whether to apply the exclusionary rule in the absence of settled authority applicable to the use of new investigative technology, the court considers the Supreme Court's observation that "under *Leon*'s good faith exception, we have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." *Davis v. United States*, 564 U.S. 229, 240, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) (citing *Herring v. United States*, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009)).

> When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. [*Herring*, 555 U.S. at 144, 129 S.Ct. 695.] But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, *Leon*, [468 U.S.] at 909, 104 S.Ct. 3405, or when their conduct involves only simple, "isolated" negligence, *Herring, supra*, at 137, 129 S.Ct. 695, the " 'deterrence rationale loses much of its force,' " and exclusion cannot "pay its way." *See Leon, supra*, at 919, 908, n. 6, 104 S.Ct. 3405 [internal citation omitted].

*Id.* at 238, 131 S.Ct. 2419. Here, the law enforcement officers took steps to obtain court authorization under the pen register procedures that they believed were applicable to use of the Stingrays for tracking the location of Ellis's cell phone. Officer Saunders's application did not mislead the issuing judge about the purpose of the pen register order, which included locating Ellis's cell phone with information about "cell site and/or location sites" and "on an ongoing and/or real-time basis, the location of cell site/sector (physical address)" for outbound and incoming calls and "the direction and strength of a signal" during a call in progress. The application articulated specific facts and circumstances giving rise to the need to locate Ellis and his coconspirators. The pen register order did not amount to a mere "rubber stamp" or otherwise indicate that the judge wholly abandoned his judicial role in approving the pen register application.

Under the totality of the circumstances, where the state court judge had reviewed a detailed affidavit which he found demonstrated probable cause to issue a search warrant earlier that morning, at 1:05 a.m., the OPD and FBI Stingray operators reasonably relied on the emergency pen register procedures to deploy the Stingray devices. In particular, the FBI relied in objectively good faith on then-current DOJ policy and practice construing the pen register statute to cover the use of cell site simulators. In *Illinois v. Krull*, 480 U.S. 340, 349, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), the Supreme Court recognized that the *Leon* exception applies if officers obtain evidence in objectively reasonable reliance on a statute that is subsequently declared unconstitutional, reasoning that "[t]here is no basis for applying the exclusionary rule to exclude evidence obtained when a law enforcement officer acts in objectively reasonable reliance upon a statute, regardless of whether the statute may be characterized as 'substantive' or 'procedural.' " *Id.* at 356 n.12, 107 S.Ct. 1160. In weighing whether suppression

would have significant deterrent effect, the court in *Krull* determined as follows:

> There is nothing to indicate that applying the exclusionary rule to evidence seized pursuant to the statute prior to the declaration of its invalidity will act as a significant, additional deterrent. Moreover, to the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the "substantial social costs exacted by the exclusionary rule." [*Leon*, 468 U.S. at 907, 104 S.Ct. 3405.] When we indulge in such weighing, we are convinced that applying the exclusionary rule in this context is unjustified.

*Krull*, 480 U.S. at 353, 107 S.Ct. 1160.

Because the FBI proceeded here under a mistaken understanding of the statute, rather than a statute that has been found unconstitutional, *Krull* does not squarely apply. However, the *Krull* analysis is instructive to determine whether applying the exclusionary rule would have significant deterrent effect to warrant suppression of evidence. Law enforcement's view that the use of the Stingrays was authorized under the provisions of the pen register statute, an unsettled question that has yet to be decided by any appellate authority, is distinguishable from a mistaken understanding of the law supporting a belief that a suspect has broken the law. *Cf. United States v. Lopez-Soto,* 205 F.3d 1101, 1106–07 (9th Cir. 2000) (officer lacked reasonable suspicion to stop defendant based on mistaken belief about proper placement of registration sticker). While the court holds that probable cause is required to use CSS devices to pinpoint the location of a cell phone, the OPD and FBI's reliance four years ago on the view that the pen register statute governed the use of the Stingrays, which were configured so as not to capture any content of communications, was not objectively unreasonable.

Where the OPD had applied for and obtained a search warrant for Ellis's apartment before the Stingrays were deployed, and Officer Saunders applied for a pen register order that authorized wireless carriers to provide law enforcement with cell site/sector location information for Ellis's phone, for which the issuing judge did not require a showing of probable cause, the OPD and FBI used the Stingrays in objectively reasonable reliance on the emergency provisions of the pen register statute and the pen register order. The court finds that the officers were acting "as a reasonable officer would and should act in similar circumstances," such that "excluding the evidence can in no way affect [their] future conduct unless it is to make [them] less willing to do his duty," so as to warrant the good faith reliance exception. *United States v. Crews*, 502 F.3d 1130, 1136 n.4 (9th Cir. 2007) (citing *Leon*, 468 U.S. at 920, 104 S.Ct. 3405) (internal marks omitted). Accordingly, the motion to suppress is DENIED on this additional ground.

### 2. Inevitable Discovery

█ The government also argues that under the inevitable discovery doctrine, Ellis undoubtedly would have been located by the OPD inside the apartment building, even without the use of the Stingray devices.

█ The inevitable discovery exception to the exclusionary rule permits the admission of otherwise excluded evidence "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police...." *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) (quoting *Nix v. Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). "If the prosecution can establish by a preponderance of the evidence that the information ultimate-

ly or inevitably would have been discovered by lawful means...then the deterrence rationale has so little basis that the evidence should be received." *Nix*, 467 U.S. at 444, 104 S.Ct. 2501.

Here, the evidence in the record reflects that police officers and SWAT members had established a perimeter around 1759 Seminary by at least 10:41 pm, according to the CAD reports, well before the first Stingray device was deployed. They had also sent in a robot and bean bags and instructed residents to stay away from the windows, believing that suspects were inside the building. While the cell phone location information obtained by the Stingrays facilitated locating Ellis in a specific apartment, under these circumstances, the police would have eventually found Ellis inside and apprehended him, even without the use of the Stingrays. *See United States v. Takai*, 943 F.Supp.2d 1315, 1324–25 (D. Utah 2013) (denying motion to suppress based on warrantless cellphone GPS pinging data from cellular providers pursuant to 18 U.S.C. § 2702(c)(4), where the defendant's location was already being staked out and discovery was inevitable even absent the cellphone GPS pinging data).

Accordingly, the court finds that the inevitable discovery exception is a separate ground for DENYING the motion to suppress.

### E. Failure to Disclose Stingray in Pen Register Application

██ Because the government relies on the pen register order to authorize the use of the Stingrays, Ellis requests a *Franks* hearing based on the affiant's misleading omissions in the pen register application about the use of cell site simulators by the FBI and OPD. Doc. no. 304 at 22 (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). Ellis argues that the officer failed to disclose to the state court judge that MetroPCS would not be conducting the surveillance, but that the FBI and OPD would each use Stingrays to locate Ellis's phone. Ellis contends that the application fails to particularize the information to be collected from the Stingrays or from whom. *Id.* Ellis also argues that the OPD and FBI deliberately misled the state court judge by omitting any reference to the use or capabilities of the Stingray devices in seeking the pen register order, and that a *Franks* hearing is warranted by the government's misleading statements to the court.

As discussed above with respect to good faith reliance on the pen register procedures, Officer Saunders's failure to explain that a Stingray device would be used by law enforcement to locate the cell phone did not amount to a knowingly false statement or reckless disregard for the truth, where such details of execution were not required to be specified under *Dalia*, 441 U.S. at 258, 99 S.Ct. 1682. In *Patrick*, the Seventh Circuit rejected a defendant's challenge to the failure of the police to disclose in a location-tracking warrant application that they planned to use a cell-site simulator, implying that they would obtain location information from his cell phone company's data. *Patrick*, 842 F.3d at 544. The court in *Patrick* held that under *Dalia* and *Richards* (holding that no-knock entry in executing search warrant was reasonable under the circumstances even though the issuing judge denied the request for advance authorization for no-knock entry), "the police could have sought a warrant authorizing them to find [a suspect's] cell phone and kept silent about how they would do it." *Id.* The *Patrick* court reasoned that under the authority of *Dalia* and *Richards*, and other considerations, "the Fourth Amendment *forbids* judges to attempt to regulate, *ex ante*, how a search must be conducted, and confines the judiciary to *ex post* assessments of reasonableness." *Id.*

at 544–45 (citing Orin S. Kerr, *Ex Ante Regulation of Computer Search and Seizure*, 96 Va. L. Rev. 1241, 1260–71 (2010)). *See also United States v. Rigmaiden* ("*Rigmaiden III*"), 2013 WL 4525252, *5 (D. Ariz. Aug. 27, 2013) (denying motion for reconsideration of denial of suppression motion, rejecting arguments that the tracking warrant lacked particularity and that the government violated its duty of candor by failing to disclose additional technical details of the mobile tracking device used to locate the defendant's aircard, following *Dalia*).

In light of these authorities, the omitted references to the Stingray devices at issue do not demonstrate knowingly false statements or reckless omissions of material fact to the state court so as to warrant an evidentiary hearing. *See United States v. Stanert*, 762 F.2d 775, 781 (9th Cir.), *amended*, 769 F.2d 1410 (9th Cir. 1985) (requiring "that the defendant make a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading" to warrant a hearing under *Franks*). Here, the pen register order authorized the OPD and FBI to obtain real-time information about cell site/sector location and signal direction and strength for Ellis's phone, the purpose of which was to determine the location of Ellis's cell phone. Doc. no. 304, Ex. I. Under *Dalia* and *Chen*, and the persuasive authority of *Patrick*, the OPD affiant was not required to disclose the use of the Stingray devices to determine Ellis's cell phone location. Accordingly, Ellis has not demonstrated that a *Franks* hearing is warranted.

### F. Possibility of Interceptions in Violation of Title III

Ellis contends that if the Stingrays used by OPD and the FBI captured content or were used as a microphone to pick up conversations, even if not recording or capturing them, then their use violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq. Doc. no. 304 at 19–20. Title III requires an application for an order authorizing interception of a wire, oral, or electronic communication to establish probable cause to believe "that an individual is committing, has committed, or is about to commit a particular offense," and probable cause to believe that "particular communications concerning that offense will be obtained" by intercepting communications over the targeted facilities. 18 U.S.C. § 2518(3). Each application and order must contain a "particular description of the type of communication sought to be intercepted." 18 U.S.C. §§ 2518(1)(b)(iii) and (4)(c).

It is undisputed that neither the OPD nor FBI applied for an order for electronic surveillance under 18 U.S.C. § 2518, and that the state court order did not authorize interception of communications from the target phone. Ellis points out that cell site simulators are capable of intercepting conversations by using the target cell phone as a microphone, and suggests that there is evidence to suggest that the police were listening to conversations on his phone by using the Stingrays. *See* doc. no. 304, Ex. O (USABook excerpt on electronic surveillance referring to the possibility of using Stingrays to "intercept conversations using a suspect's cell phone as the bug"). Ellis cites the police radio recordings of officers discussing "some activity on the phone right now" and that "he's live on his uh every couple minutes." Doc. no. 304–1 (Boersch Decl.) ¶ 19. Ellis suggests that this evidence is inconsistent with the government's representations that the Stingrays used in this case did not capture or collect content, but he merely speculates that the Stingrays were configured to intercept conversations through his cell phone. The police officers' conversation

about activity on the phone does not support an inference that the content of the conversations were being intercepted, particularly in light of the declarations by law enforcement officers who attested that the Stingrays did not obtain or collect content or communications from the target cell phone.

The unnamed OPD operator states in his declaration that the OPD's cell site simulator (1) "was not configured to capture the content of any communications, including data contained on the phone itself;" (2) "does not remotely capture e-mails, texts, contact lists, images, or other data from the phone, nor does it, as configured, provide subscriber account information;" and (3) "[t]he device used to locate the defendant's cell phone therefore did not capture, collect, decode, view or otherwise obtain any content transmitted from the defendant's cell phone or any others in the area." Doc. no. 321, Ex. G ¶ 8 and Ex. H.

Similarly, the unnamed FBI agent's declaration indicates that "cell site simulators used by Federal, state, and local law enforcement must be configured as pen registers, and may not be used to collect the contents of any communication, in accordance with 18 U.S.C. § 3127(3)[, including] any data contained on the phone itself." Doc. no. 321, Ex. I ¶ 7. The FBI agent further states, "[t]he cell site simulator does not remotely capture e-mails, texts, contact lists, images, or other data from the phone, nor does it, as configured, provide subscriber account information (such as an account holder's name, address, or telephone number)." Id. With respect to the use of the FBI cell site simulator on January 22, 2013, to locate Ellis's cell phone, "it only obtained the signaling information relating to that particular phone[;] such signaling information did not include content such as e-mails, texts, contact lists, images, or other data from the

phone, nor did it provide subscriber account information." Id. ¶ 11. The FBI agent attests that "[i]n line with general FBI policy and practice," the cell site simulator equipment was not configured to collect (1) any content contained on or transmitted by the target device; (2) subscriber account information; or (3) voice or other audio communications from any device in the area, including the targeted device. Id. ¶ 13. See also doc. no. 321, Ex. J ¶ 7 (Decl. of FBI Program Manager).

The evidence in the record is sufficient to determine that the cell site simulators were not used to intercept conversations or other communications over cell phones in violation of Title III. See *United States v. Oliva*, 705 F.3d 390, 397–400 (9th Cir. 2012) (affirming denial of motion to suppress where defendant argued that orders authorizing government to intercept wire communications to and from certain target phones under Title III could have given the government broader authority to convert the targeted phones into roving bugs or roving wiretaps, where the government disavowed such surveillance). Ellis's motion to suppress for violation of Title III is therefore DENIED.

## II. Ellis's Motion to Suppress Evidence Seized from Apt. 212

 Ellis seeks suppression of evidence seized from his apartment, No. 212, on the ground that the government has failed to produce the original file-stamped search warrant and warrant affidavit, and has thereby failed to demonstrate that the search of Apartment 212 was conducted pursuant to a valid search warrant. Alternatively, Ellis seeks suppression of the evidence given the extraordinary delay from when the search was conducted and when the search warrant was returned and filed with the state court. Doc. no. 307.

## A. Lack of Original Warrant

Although the defense has not previously moved to suppress the search warrant for lack of the original, the court has already addressed the validity of the search warrant for Apartments 108, 110 and 212 in denying defendants' earlier motions to suppress. 10/29/15 Order. In brief, the court found that after police responded to the shooting of a police officer the evening of January 21, 2013, OPD secured the apartment complex and obtained a valid search warrant, supported by a showing of probable cause, to search Apartments 108, 110 and 212. Having reviewed the relevant evidence in the record, including the factual statements in the unredacted search warrant affidavit based on information provided by a confidential informant, filed under seal, the court determines that despite the absence of an original file-stamped warrant, the record is sufficient to determine that OPD conducted a search of Apartment 212 pursuant to a warrant. *See* Gov't Ex Parte Submission of Proposed Redactions to State Court Warrant Affidavits for In Camera Review (filed under seal November 12, 2014). Defense counsel's continued objections to the court's reliance on redacted information to determine the validity of the search warrants are overruled in light of the government's prior representations that the informant will not be called to testify and the redacted information will not be offered at trial to prove the charged conduct. *See McCray v. Illinois*, 386 U.S. 300, 311, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *United States v. Fixen*, 780 F.2d 1434, 1439 (9th Cir. 1986).

Ellis also points out inconsistencies in the search inventory and police reports, doc. no. 307 at 15, such as Officer Milina's failure to list the three handguns from Apartment 212 in his report, Ex. Q, or the failure to list the handguns in the search inventory, Ex. G. The government responds that Milina's inventory does in fact refer to "Box w/ 3 glock pistols" and that his report explains that he gave the firearms to Technician Jaecksch, who documented them in her report, which explains the omission of the guns from Milina's property record, Ex. T. Doc. no. 322 at 9 (referring to Jaecksch report at Bates 3447).

Ellis further takes issue with the fact that the police left a blank search warrant in Apartment 212, which has no indication that portions were redacted, suggesting that Judge Horner may have signed a blank warrant which would be overbroad. Doc. no. 325 at 3–4 and Reply Ex. A. This suggestion is purely speculative and unreasonable in light of the record. The government cites Officer Milina's declaration, filed in opposition to Ellis's earlier suppression motion, stating that he left a redacted version of the warrant per OPD policy. Doc. no. 322 at 6–7 (citing doc. no. 95–4). The government also compares the copy of the unredacted warrant produced to defendants with the redacted copy left at the scene, and points out there are no discrepancies in Judge Horner's signature and date. Doc. no. 322 at 7. Even if the police had not provided Ellis with any copy of the warrant, suppression of evidence obtained pursuant to a valid search warrant would not be justified. *United States v. Hector*, 474 F.3d 1150, 1154–55 (9th Cir. 2007) ("On its face, the Fourth Amendment does not require that a copy of the warrant be served on the person whose premises are being searched.") (citing *United States v. Banks*, 540 U.S. 31, 35, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003) ("The Fourth Amendment says nothing specific about formalities in exercising a warrant's authorization.")).

The government has demonstrated that the OPD and FBI applied for, and obtained, a search warrant for Apartment

212, as corroborated by the timeline of events and the warrants that were issued contemporaneously. The years-long delay in locating and filing the original warrant that was issued by the state court judge may raise concerns about clerical operations after the search was conducted, but does not weigh against a finding that the police searched Apartment 212 pursuant to a warrant. To the extent that Ellis challenges the failure to produce the original warrant, the lack of an original may impact admissibility of that document at trial, but does not so outweigh the evidence, demonstrating that a warrant was issued, as to require suppression of the fruits of the search. Under Ninth Circuit authority, "California courts uniformly recognize that statutory provisions covering the filing and return of a search warrant are ministerial in nature, the violation of which does not in itself invalidate an otherwise lawful search or require suppression of evidence seized thereby, at least in the absence of demonstrated prejudice to the defendant." *United ed States v. Towne*, 997 F.2d 537, 542 n.3 (9th Cir. 1993) (where the court file was missing an attachment incorporated by reference in a search warrant, court may consider extrinsic evidence to determine if attachment accompanied warrant when search was authorized and carried out, and whether to treat the missing attachment as part of the warrant). As defense counsel concedes, there is no state court authority requiring suppression as a remedy for failure to comply with the search warrant return procedures. *See People v. Head*, 30 Cal.App.4th 954, 958, 36 Cal.Rptr.2d 1 (1994) ("No California case has yet held that a late or otherwise faulty return violates the Fourth Amendment.").

Accordingly, the fact that the original search warrant cannot be located in the state court record does not establish that the warrant was invalid or that the search of Apartment 212 was unreasonable. The motion to suppress the evidence seized from Apartment 212 for lack of the original search warrant is therefore DENIED.

## B. Prejudice from Delay

In the alternative, Ellis contends that he has been prejudiced by the government's delay of nearly four years in filing the return of the search warrant in state court, which has led to extensive litigation over producing the file-stamped warrant to determine its validity. He asserts that the delay has prejudiced all defendants by diverting time and resources to litigating the issue and by extending the length of their pretrial detention, particularly Ellis who has been in solitary confinement for most of that time. Ellis further argues that the delay raises uncertainty over the discrepancies in the copies of the search warrant and the police records related to the search, particularly given that defense counsel still cannot locate the original search warrant in the state court file.

The government accepts responsibility for the delay, almost three years after this case was commenced in December 2013, in realizing that the original search warrant and Ellis's arrest warrant had not been returned to the state court until September 2016 when they were discovered in the OPD's files that were in the FBI's custody. Doc. no. 322 at 4.

Though the delay in locating the original file-stamped search warrant for Apartments 108, 110 and 212 is ongoing and is now approaching four years, Ellis has not demonstrated prejudice from this delay in light of the record. In November 2014, the court reviewed the search warrant affidavits in camera and approved certain redactions proposed by the government. The government represents that it produced a redacted copy of the search warrant affidavit for Apartment 212 in December 2014, and a copy of the warrant was subsequently produced in May 2015, after which the

parties litigated defendants' pretrial motions, including motions to suppress. Doc. no. 322 at 2–3. Thus, defendants have had copies of the search warrant and redacted affidavit for over two years, enabling defendants to challenge the probable cause showing and prepare a defense. Ellis has not shown that the lack of the original search warrant has been so prejudicial as to merit suppression of the evidence. *See United States v. Motz*, 936 F.2d 1021, 1025 (9th Cir. 1991) (suppression not warranted where the agents executed a valid search and the defendants "were not prejudiced by the agents' failure to perform the ministerial requirements" for return and inventory under Rule 41).

Accordingly, Ellis's motion to suppress evidence seized from Apartment 212 on the ground of prejudicial delay is DENIED.

**IT IS SO ORDERED.**